### RED BUD REALTY COMPANY v. SOUTH.

Opinion delivered May 1, 1922.

1. CORPORATIONS—VENUE OF ACTION AGAINST.—Under Crawford & Moses' Dig., § 1176, a minority stockholder's action against a corporation and the majority stockholder was properly brought in the county from which the corporation had moved its place of business where the codefendant resided and was served therein, regardless of whether the removal of the *situs* of the corporation was in compliance with § 1737, *Id.*

2. EQUITY—MULTIFARIOUSNESS.—A bill by a minority stockholder against the corporation and its principal stockholder, alleging that the latter had appropriated assets of the corporation, and

against a transferee to which the corporation had conveyed assets without consideration, seeking to set aside such conveyances and to require the principal stockholder to render an accounting, is not multifarious.

3. EQUITY—MULTIFARIOUSNESS.—The question whether a bill is multifarious is to be determined by the particular facts of the case, and is largely within the court's discretion.

4. EQUITY—MULTIPLICITY OF SUITS.—To prevent a multiplicity of suits is itself a distinct ground of equity jurisdiction.

5. CORPORATIONS—RIGHT OF MINORITY STOCKHOLDER TO SUE.—Where the president and majority stockholder transferred assets of the corporation to third persons without consideration, a minority stockholder could sue such majority stockholder, the corporation and transferees in the same suit to require an accounting and to ascertain the right of the corporation and transferee as to property so transferred.

6. CORPORATIONS—RIGHT TO SUE ON BEHALF OF.—As a rule a stockholder cannot maintain an action in his own name to enforce the rights of a corporation, and such action ordinarily can be maintained only by the corporation itself under authority of its board of directors.

7. CORPORATIONS—SUIT BY MINORITY STOCKHOLDER.—Where a majority of the managing board of a corporation have betrayed their trust, and are guilty of *ultra vires* or fraudulent acts, and are thus perverting the purposes of the corporation, or are diverting the assets to their own use in fraud of the rights of other stockholders, a minority stockholder may bring suit in his own name for the benefit of himself and other injured stockholders.

8. CORPORATIONS—NECESSARY PARTIES.—In a suit by a minority stockholder against the majority stockholder alleged to be diverting the corporate assets to his own personal use, the corporation is a necessary party.

9. CORPORATIONS—SUIT BY MINORITY STOCKHOLDER—NECESSITY OF PROTEST.—Where a majority stockholder controlled a majority of the directors, a minority stockholder suing the majority stockholder for diversion of the corporate assets was not required to allege and prove as a condition precedent to the action that he protested to the board of directors against their mismanagement and appealed to them for redress, since such a protest would have been futile.

10. ATTORNEY AND CLIENT—RIGHT OF CLIENT TO CONTROL SUIT.—Where an attorney of record undertook to dismiss his client's cross-bill, whereupon plaintiff's attorney represented to the court that he had consented to the judgment asked by the cross-bill

and showed a telegram from cross-complainant denying that any one had a right to dismiss its cross-bill, the court properly refused to dismiss the cross-bill.

11. INTEREST—INCREASED RATE AFTER MATURITY OF NOTE.—A provision in a note for a higher rate of interest after maturity *held* valid where increased rate did not exceed the maximum rate allowed by Const. art. 19, § 13.

12 EQUITY—SUPPRESSION OF DEPOSITIONS TAKEN AFTER TIME.—Depositions taken after announcement of parties that they had no further testimony to offer, after the master had filed his report, without application to the master to reopen the case for taking of further testimony, and without a showing that diligence had been exercised to discover and produce the testimony before the taking of testimony had been closed, were properly suppressed, though there was no chancellor to whom application could be made to reopen the case, as the master had discretion to reopen the case for the taking of further testimony.

13. CORPORATION—GOOD FAITH IN MANAGEMENT.—One who, as president and principal stockholder of a corporation, controlled its management, was a trustee of the funds of the corporation and required to exercise the utmost good faith in handling and accounting therefor.

14. CORPORATIONS—BURDEN OF PROOF.—In a suit against the president and acting manager of a corporation, who is alleged to have diverted its assets to his own use, the burden was on him to prove how the funds of the corporation had been expended.

15. CORPORATIONS—ACCOUNTING—ULTRA VIRES ACTS.—In a suit against the president and manager of a corporation for diverting its assets, he is not entitled to credit for an amount expended in the purchase of stock of another corporation; such purchase being *ultra vires.*

16. CORPORATIONS—CONVEYANCE IN PAYMENT OF DEBT.—In a suit against the president and manager of a corporation to compel an accounting for corporate assets and funds, proof that land had been conveyed in payment of a debt of the corporation *held* to relieve the president from liability.

17. CORPORATIONS—LIABILITY FOR NEGLIGENCE IN PAYING TAXES.—In a suit against the president and manager of a corporation to compel an accounting of corporate funds and assets, defendant is not entitled to credit for the amount of interest, penalties and costs which he was required to pay by reason of his negligence in failing to pay taxes when due.

18. CORPORATIONS—ACCOUNTING—CREDITS.—In a suit against the president and manager of a corporation for an accounting of

corporate funds and assets, defendant was not entitled to credit for an amount which he testified the directors had voted for salary of the secretary, in the absence of any proof that such salary was ever paid.

19. CORPORATIONS—DISSOLUTION.—Chancery has jurisdiction, without statutory authority and in the absence of corporate insolvency, to dissolve a corporation and order a sale of its assets, where the president and majority stockholder was not managing the corporation for the benefit of the other stockholders, but was merely using the corporation for his own private purposes and ignoring the rights of the other stockholders.

Appeal from Baxter Chancery Court; *Sam Williams*, special chancellor; modified.

*Allyn Smith*, for appellants.

1. The Red Bud Realty Company could not rightfully be sued in Baxter County. Conceding that the removal of the *situs* of this corporation was not in compliance with the requirements of C. & M. Digest, § 1737, yet its principal office was in fact removed. The residence of a corporation is where the management is carried on. 147 Ind. 292; 46 N. E. 641. Its principal office being in Little Rock, service of summons upon it in Pulaski County did not give the chancery court of Baxter County jurisdiction over it. 109 Ark. 77; C. & M. Dig., 1171. On the question of *de facto* removal, see 134 Ark. 23; 121 *Id.* 541; 1 Thompson on Corporations, 2nd Ed., § 234; 114 Ark. 344; 36 Kan. 128; 47 *Id.* 250; 10 Atl. 471; 47 N. J. L., 218; 126 Mass. 303; 51 Kan. 631; 159 S. W. 1143, 1144.

2. The motion to dismiss for multifariousness of the complaint should have been sustained. C. & M. Digest, §§ 1076, 1077, 1078, 1292, subdiv. 2; 74 Ark. 536; 19 N. W. 741; 21 Kan. 474; 30 Conn. 316-323; 104 U. S. 245; 59 Ill. 389-401; 9 Paige (N. Y.) 188-194; 44 Mo. 350; 9 Mich. 45; 104 U. S. 245; 11 Ark. 726. The principle of multifariousness applies ''where two parties are attempted to be brought together by a bill in chancery who have no common interest in the litigation, whereby one party is compelled to join in the expense and trouble of a suit in which he and his codefendant have no common in-

terest." 128 U. S. 315; 18 How. (U. S.) 253; 57 Fla. 489; 222 Fed. 142; 188 U. S. 56; 26 Kan. 47; 51 *Id.* 617; *Id.* 39; 25 *Id.* 665.

3. The complaint does not state, neither does the evidence prove, a cause of action. A necessary allegation, which should have been followed by proof, was that the plaintiff had demanded and endeavored to procure redress for his alleged wrongs by application to the company, and this demand is a condition precedent to the right to maintain the action. 104 U. S., 450; 134 Pac. 665; 110 U. S. 219. That a corporation has not been successful, and that a stockholder is dissatisfied, is no ground for equitable relief. 84 Kan. 828; 149 Pac. 879. See also 233 S. W. (Ark.) 713. Allyn Smith had never been dismissed as attorney for Missouri State Life Insurance Company, and was its sole attorney of record, Pettit & Pettit having withdrawn from the case long before the commencement of the trial. He had the right to withdraw the answer. 11 Ark. 230.

5. The provision in the notes for a greater rate of interest after maturity than was stipulated they should bear until maturity was in the nature of a penalty, and not enforcible in equity. 14 Ark. 329; 2 Minn. 352, 72 Am. Dec. 102; 6 Kan. 395; 18 John 223; 16 Ill. 400; 2 Aïkens (Vt.) 106; 16 N. Y. 469, 1 Am. Rep. 329; 5 Cowan 569; 6 How. 154; 5 Sanford 192; 39 N. J. Eq. 590; 8 Blk. 140; 1 Yeager 602; 78 Ill. 53; 3 Iowa 244; 6 Mumf. 71; 15 Mass. 177; 112 *Id.* 204; 29 Conn. 268. See also 73 Ill. App. 691; 22 How. 118; 22 Wall. 170; 100 U. S. 72; 104 U. S. 771, 26 Law. Ed. 923; 38 Ark. 114; 36 *Id.* 355; 46 *Id.* 87; 54 *Id.* 437; 98 *Id.* 519.

6. The court erred in suppressing the depositions taken in February and March, 1921, both because there was no chancellor to whom to apply for leave to reopen the case and take the depositions, and because defendants had the right to rely on the rule established by the court in that circuit. 32 Ark. 721; 55 Ark. 163; 54 *Id.* 124; 15 S. W. 153; *Id.* 154.

7. There was no warrant of law for decreeing a dissolution of the corporation. The statutes of this State recognize only two grounds for the dissolution of a corporation, viz: insolvency, and ceasing to do business. 111 Ark. 238; 84 Kan. 828, and cases cited; 125 S. W. 184, 195; 135 S. W. 938; 10 Encl. of Law and Proc. 1035; High on Receivers, 289 § 288; 4 Thompson on Corp. § 438; 143 Ill. 197; 1 Edw. Ch. (N.Y.) 84; 44 Barb (N. Y.) 239; 99 Mass. 274; 1 Hopk. Ch. (N. Y.) 354; 80 N. Y. 605; 127 Ill. 257; 2 Johns. Ch. (N. Y.) 371; 5 Id. 366; 8 Humph. (Tenn.) 234; 3 N. J. Equity, 332; 55 Wis. 624, 13 N. W. 895; 16 Cal. 145.

*W. C. Alley, John T. Castle* and *Frank Pace,* for appellees.

1. The jurisdiction in the Baxter Chancery Court was complete, not only because the alleged removal of the *situs* of the corporation was void for failure to comply with the statute, C. & M. Digest, § 1737; 106 Ark. 552; 8 Thompson on Corporations, § 494; 96 U. S. 369; 24 Law Ed. 853; 104 N. E. 750. But also because, by virtue of the statute, C. & M. Digest, § 1176, that court acquired jurisdiction by reason of the fact that service was had upon one of the defendants in that county, being the domicile of that defendant, and that gave jurisdiction of the defendant served in Pulaski County. 122 Ark. 502; 4 Fletcher on Corporations, § 2975.

2. The complaint is not bad for multifariousness. The object of the suit is to recover corporate property fraudulently transferred by the managing officer of the corporation, and the cancellation of certain instruments executed by that officer in carrying out his fraudulent schemes, is incident to the relief sought. It is well settled that such matters can be litigated in one suit. 21 Corpus Juris, 416, § 435; *Id.* p. 420; 9 Minn. 183 and authorities cited; 104 N. W. (Minn.) 817; 136 N. W. 271; 91 Pac. 667; 147 Fed. 295; 128 U. S. 403; 182 Fed. 215.

3.   Powell, owner of a majority of the capital stock of the corporation, gained and held complete control and dominated its affairs. It would have been useless to apply to the corporation for relief. It was therefore unnecessary for the plaintiff to make such demands before instituting the suit. 3 Cook on Corporations, § 741; 19 S. W. (Mo.) 82; 97 *Id.* 202; 59 Ore. 483; 188 Mass. 515; 104 Vt. 121; 156 Fed. 389; 91 Pac. 1091; 192 Iowa 733; 39 Minn. 1; 82 Ala. 437; 141 Ill. 320.

4.   There was no error in refusing to permit Allyn Smith to withdraw the answer and cross-complaint of Missouri State Life Insurance Company. An attorney has no authority to dismiss a cause of action over the objection of his client. 6 C. J. 646, § 1511; 95 N. W. 684; 1 Thornton on Attorneys at Law, 458; *Id.* § 215; 2 Chit. P. (Vt.) 117; 2 Greenleaf, Evidence, 2nd Ed. 140, § 145; 11 Ark. 230; 6 C. J. 643; 200 Ill. 84; 65 N. E. 690; 117 Ark. 504; 140 *Id.* 587.

5.   The provision in the notes for a higher rate of interest after maturity, was not a penalty, and the same was enforcible as written. Moreover this question was not raised in the lower court and should not be considered here. 3 C. J. 689; *Id.* 695; 106 Ark. 525; 29 *Id.* 500; 64 *Id.* 305; 74 *Id.* 241; 57 *Id.* 312; 101 *Id.* 22; 95 *Id.* 593; 89 *Id.* 300; 84 *Id.* 399; 80 *Id.* 476; 77 *Id.* 195; 76 *Id.* 551; 80 *Id.* 65. On the proposition that the provision is enforcible, see C. & M. Dig., § 7353; 22 Cyc. 1526; 32 Ark. 573; 33 *Id.* 416; 52 Kan. 579; 35 Pac. 201; 71 *Id.* 836; 130 *Id.* 665; 147 *Id.* 826; 154 *Id.* 1108 and authorities cited; 104 Fed. 584 and authorities cited; C. & M. Digest, § 7361.

6.   The court properly suppressed the depositions taken in February and March, 1921. It was the master's duty, under the statute, to take all of the testimony in the matter submitted to him. C. & M. Dig., §§ 7154-7160. It is too late, after the evidence is concluded, the report filed, the decree rendered and the appeal perfected, to raise for the first time the question of irregularities on

the part of the master in taking the testimony. 52 Ark.
437. After the master had closed the taking of deposi-
tions, it was the duty of the defendants, on the discovery
of new evidence they desired to submit, to apply to him
to reopen the case and take the additional testimony.
23 Corpus Juris 613; 83 Fed. 772; 96 Ill. App. 323.

The suppression of depositions rests in the sound
discretion of the court, and unless that discretion has
been abused, it will not be disturbed on appeal. 56 So.
235; 91 S. C. 549; 88 S. C. 360; 56 Penn. Sup. Ct. 183;
18 Corpus Juris, 727, § 331.

7. The Red Bud Realty Company having ceased to
transact the business for which it was chartered, the de-
cree dissolving the corporation was right. C. & M. Dig.,
§ 1820; 4 Pomeroy, Equity Jur. 4th Ed. § 1540; 53 N.
W. 218; 162 N. W. 1056; 179 Pac. 608; Helliwell on
Stock and Stockholders, 792; 60 So. 1918.

WOOD, J. The Red Bud Realty Company, herein-
after called corporation, is a domestic corporation having
a capital stock of $50,000 divided into 2,000 shares, of
the par value of $25 each. The corporation was organ-
ized in 1903 for the purpose of transacting a general real
estate business. The assets of the corporation consisted
originally of a tract of 202 acres of land situated along the
White River branch of the St. Louis, Iron Mountain &
Southern Railway Company in Baxter County, Arkansas.
A townsite was established on this tract of land called Cot-
ter, and the town was laid out into lots and blocks. The *si-
tus* of the corporation was the town of Cotter, and its prin-
cipal business was the sale and disposition of lots in that
town. At the organization of the corporation W. V. Pow-
ell was elected president, J. C. South, secretary, and
Thomas Combs, treasurer. In 1907 J. C. South, who was
a minor stockholder, instituted an action against the cor-
poration and the majority stockholders to require the
president to account for large sums of money which it
was alleged he had misappropriated. The litigation re-
sulted in placing the corporation in the hands of a receiv-

er. At the end of this litigation in 1910 (see *Red Bud Realty Co.* v. *South,* 96 Ark. 281) the receivers made settlement of the affairs of the corporation and turned the assets in their hands over to the corporation.

On April 11, 1911, there was a regular meeting of the stockholders at Cotter. At this time Powell controlled three-fifths of the capital stock of the corporation, less one share; South owned one-fifth plus one share, and Judge J. B. Baker owned the balance. All of the stockholders were present at this meeting in person or by proxy. J. C. South was represented at the meeting by Z. M. Horton. At this meeting Powell was again elected president and John M. Rose, to whom Powell had given four shares of stock, was elected secretary and treasurer. At this meeting of the stockholders John M. Rose moved that the offices of the corporation be moved from Cotter to Little Rock, which motion was carried. At the April term, 1917, of the chancery court of Baxter County, South filed a complaint in which he named the corporation, W. V. Powell, the Missouri State Life Insurance Company (hereafter called insurance company), and the Dixie Power Company (hereafter called power company) as defendants. Among other things he alleged that Powell since the 10th of June, 1911, had fraudulently sold and appropriated to his own use more than $10,000 of the property of the corporation and had refused to account to the corporation or its minority stockholders, of whom plaintiff was the principal one; that he had without any consideration fraudulently sold lots to his wife, Kate V. Powell, of the value of $1,800; that he had fraudulently conveyed various tracts and lots, the property of the corporation, to other parties, without consideration and for secret consideration; that he had failed to pay the taxes on the property of the corporation for the year 1914, although he had ample funds in his hands belonging to the corporation, and allowed the lands to be forfeited and sold for taxes, costing the corporation the sum of $1,000 to redeem the lands from the tax sale; that, pretending to act as president of the corporation, he had borrowed

from W. F. Eatman in the year 1913 the sum of $1,250 and had fraudulently executed a promissory note for same, signed by the corporation; that he had fraudulently converted the money to his own use; that, as president of the corporation, he had borrowed the sum of $3,000 from the insurance company, and had fraudulently, and without authority from the corporation, executed a mortgage on the lands of the corporation to cover same, and had converted the proceeds to his own use; that he had fraudulently and without authority of the corporation attempted to convey to the power company ten acres of its lands.

He further alleged that the corporation, by reason of the above acts of its president, had ceased to transact the business for which it was chartered. He asked that Mrs. Kate V. Powell be made a party, and prayed that a receiver be appointed to take charge of the assets of the corporation; that an accounting be had between Powell and the corporation and its stockholders; that a lien be declared upon Powell's stock for the amount found to be due by him to the corporation; that the mortgage and various alleged fraudulent conveyances be set aside and title vested in the corporation; that the corporation be dissolved, its debts liquidated and its assets distributed to the stockholders according to their respective interests.

W. V. Powell and the corporation joined in an answer, in which they specifically denied all the material allegations of the complaint, and set up, among other things, that the suit was brought in Baxter County, where the corporation had no office and where none of its officers resided; that the principal office or place of business of the corporation was in Little Rock, Pulaski County, where process was served upon its officers; that therefore the Baxter Chancery Court had no jurisdiction. The answer detailed at length the transactions of the corporation and Powell, its president, and alleged that everything had been done regularly and according to the rules and by-laws of the corporation, and in good faith. It set up that South,

the plaintiff, from the organization of the corporation to 1915, had been a stockholder and member of the board of directors of the corporation, and had been notified to attend all of the meetings, both of the stockholders and directors; that he had persistently refused to attend the meetings except the one mentioned above, where he attended by proxy; that the membership of the board of directors was then reduced from five to three by proper amendment to the by-laws; that South had never protested to the directors or stockholders as to the policy of the corporation, and had never applied to them for relief from any of the wrongs of which he now complains. The answer further set up, among other things, that the by-laws of the corporation from the time of its organization provided for the payment of a secretary, and that after John M. Rose was elected secretary in 1911 the sum of $50 per month was paid him up to the time of his death, and that he had drawn a salary in excess of the sum of $3,000. The answer set up that the corporation, with the express consent of South, had purchased and had become a subscriber in the sum of $1,100 for the stock of the power company, which was paid out of the proceeds of the sale of the lots; that the corporation, for the purpose of aiding the power company to build a dam across White River at Cotter, entered into a contract to convey to it certain riparian rights.

The insurance company answered, and by way of cross-complaint set up its notes and deed of trust, and asked for judgment and foreclosure. This cross-action was answered by South. By agreement of the parties a master was appointed to take depositions and state an account, which he did, and made his report. Before the answer was filed, motions attacking the jurisdiction of the court were made, and these were reserved also in the answer.

The cause was heard upon the pleadings, the statements of the accounts of the master, the oral evidence of the parties, their witnesses, admissions, agreements and

exhibits. The court rendered judgment finding that Powell fraudulently managed the affairs of the corporation, substantially as alleged in the complaint, and that he was indebted to the corporation in the sum of $11,262.02; that the deed to the power company was fraudulent; that the deed to Mrs. Powell was fraudulent, and that Powell should be charged with the value of the lots deeded to her, which had passed into the hands of innocent purchasers; that the attempted removal of the *situs* of the corporation from Cotter to Little Rock was fraudulent and void; that the insurance company was entitled to judgment in the sum of $4,409.80 on its mortgage with ten per cent. interest from date thereof, which was a first lien on the property described therein, and directed that the property be sold to satisfy the same and execution had against the corporation to satisfy any residue. The court also rendered a decree in favor of South in the sum of $2,257.63 —his distributive share of the amount of the judgment against Powell and the corporation. The court, in its decree, directed that Powell's stock be sold to satisfy his debt to the corporation; that out of the proceeds the decree in favor of South should first be satisfied and the balance, if any, retained by the receivers and special master, subject to the further orders of the court. The court also entered a decree canceling the deeds from the corporation to the power company and dissolving the corporation, and directing that any assets remaining after the judgments mentioned were satisfied as ordered, be sold and the proceeds distributed among the stockholders according to their respective interests. From that judgment is this appeal. Other facts will be stated as we proceed.

1. Learned counsel for the appellants contend that the *situs* of the corporation was moved from Cotter to Little Rock by a resolution of its stockholders passed June 10, 1911, and that therefore the chancery court of Baxter County did not have jurisdiction of the corporation. He concedes that the alleged removal was not in compliance with our statute (sec. 1737, C. & M. Digest).

See also *Home Fire Ins. Co.* v. *Benton,* 106 Ark. 552. But, notwithstanding this fact, counsel insists that the resolution constituted a *de facto* removal binding upon the corporation, its stockholders, and all others except the State. This interesting question, which is so elaborately argued in the brief, pro and con, it is unnecessary to decide, and we do not decide, for the reason that, even though the domicile of the corporation was removed from Cotter to Little Rock, nevertheless the chancery court of Baxter County had jurisdiction in this action of the corporation. Under our statute, sec. 1176, C. & M. Digest, actions of this character "may be brought in any county in which the defendant or one of several defendants resides or is summoned." The corporation, Walker V. Powell, the insurance company, and the power company were named as the original defendants in the complaint filed by J. C. South in the chancery court of Baxter County. It was alleged in the complaint that Powell had fraudulently conveyed to the power company ten acres of the land which was the property of the corporation. South prayed that the deed be canceled. The power company is a domestic corporation having its *situs* at Cotter. Summons was issued and duly served upon it at Cotter. Therefore, if it be conceded that the domicile of the corporation was at Little Rock in Pulaski County, it was duly served with process in that county, which service gave the chancery court of Baxter County jurisdiction of the action against the corporation; because, as we have seen, the action had been properly instituted and service had upon one of its co-defendants, the power company, in the county of the latter's domicile. *Sallee* v. *Bank of Corning,* 122 Ark. 502.

2. The original complaint contained fifteen paragraphs. The first and second paragraphs, with the amendments thereto, allege the organization of the corporation, describe its assets, declare its purpose to be the selling of lots and blocks in the town of Cotter, and allege that Powell owned four-fifths of its capital stock and is its president.

The third, fourth, fifth and sixth paragraphs contain allegations charging Powell with fraudulently conducting the business of the corporation contrary to the laws of the State and the by-laws of the corporation in attempting to remove the *situs* of the corporation from Cotter to Little Rock; in removing South from the board of directors and denying him participation in the dividends; and in selling more than $10,000 worth of the property of the corporation and appropriating the proceeds to his own use without accounting therefor.

The seventh paragraph charges Powell with fraudulently conveying lots of the corporation of the value of $1,800 to his wife, Kate V. Powell.

The eighth paragraph charges that Powell fraudulently conveyed various lots of the corporation to other parties without consideration and for secret consideration.

The ninth paragraph charges him with failure to pay the taxes and allowing the property to be forfeited and sold for taxes, greatly to the damage of the corporation.

The tenth paragraph alleges that Powell fraudulently borrowed from one W. F. Eatman the sum of $1,250 and converted the same to his own use, and allowed judgment to go against the corporation and its property sold, to the damage of the corporation and plaintiff.

The eleventh paragraph charges that Powell fraudulently executed a mortgage to the insurance company for the sum of $3,000, and appropriated the proceeds to his own use, to the damage of the corporation and plaintiff.

The twelfth paragraph alleges that Powell fraudulently conveyed to the power company ten acres of the land of the corporation without consideration, to the damage of the corporation and its minority stockholders.

The thirteenth paragraph charges that the corporation had ceased to transact the business for which it was chartered.

The fourteenth paragraph states that Powell was indebted to the corporation in a large sum, for which the

corporation had a lien on his shares of the capital stock. The complaint concludes with prayer for an accounting and judgment against Powell, for sale of his shares of stock, and that he be restrained from further borrowing money in the name of the corporation and mortgaging or conveying its property; that a receiver be appointed to take charge of the assets; that all the alleged fraudulent conveyances mentioned be canceled, and, finally, that the corporation be dissolved, its debts liquidated, and its assets distributed to its stockholders.

Motions in apt time were made by the corporation and the power company to dismiss on the ground that the complaint was multifarious, in that it stated separate and independent causes of action in which they had no interest. Powell likewise in apt time moved to require the plaintiff to elect which cause of action he would prosecute and to strike out the causes of action improperly joined in the action against him. These motions were overruled.

The ruling of the court was correct. It will readily be seen from the above resume of the complaint that its predominant thought is that Powell, the president and majority stockholder of the corporation, had, without right and without authority, and illegally and fraudulently, sold real estate of the corporation and appropriated the proceeds of such sales to his own use, in fraud of the rights of the plaintiff, South, and other stockholders; that this alleged fraudulent conduct of Powell, in causing the property of the corporation to be conveyed and appropriating the proceeds to his own use without accounting to the other stockholders, had perverted the purpose for which the corporation was chartered. When the complaint is read as a whole, it will be observed that its primary purpose was to call Powell to an account for his alleged fraudulent conduct in the management of the affairs of the corporation, in the particulars specifically set forth therein, by setting aside as far as possible the alleged fraudulent conveyances, and, where such could not be done; to cause him to account for the proceeds of such

conveyances; and, in order to prevent and restrain him in the further alleged fraudulent use of the corporate entity to serve his own private gain in disregard of the rights of other stockholders, that the debts of the corporation be liquidated, the corporation dissolved, and its assets distributed to its stockholders.

Such being the main purpose of the action, the plaintiff had the right to ask that the corporation and all those who had acquired its property, or any interests therein, through the alleged fraudulent misconduct of its majority stockholder and managing officer, be brought in and their rights determined, even though they were not all affected alike, or in the same degree. If Powell "fraudulently, illegally, and without right, contrary to the laws of the State and the rules and by-laws of the corporation," as is charged, made the various conveyances set forth in the complaint, then all to whom these conveyances were made are affected in like manner, though in a different degree, and though their interests may be separate and independent of each other. The plaintiff set up these various conveyances, and alleged that they were fraudulent and asked for a cancellation only as incidents to the main purpose of his cause of action against Powell and the corporation for an accounting. It must be remembered that it is impossible to lay down an absolute rule that is of universal application in determining whether or not a complaint is multifarious. Each case must be governed by its own particular facts, and the question is always one largely within the discretion of the court. Here the plaintiff is proceeding upon the theory, whether right or wrong, that the conveyances of Powell to the parties mentioned were fraudulent and void, and that the property sought to be conveyed was the property of the corporation. To prevent a multiplicity of suits is of itself a distinct ground of equity jurisdiction. It follows, from what we have said, that the issues involved in this action can be, and it is most convenient and appropriate that they should be, disposed of together, thereby avoiding a multiplicity of actions. We therefore conclude

that the complaint is not multifarious. 21 C. J. 416, 434 *et seq.* to 440 inclusive; *Stewart* v. *Smith,* 91 Pa. 667; *Brown* v. *Guaranty & Trust Co.,* 128 U. S. 403; *Horner-Gaylord Co.* v. *Miller & Bennett,* 147 Fed. 295; *Venner* v. *Great Northern Ry. Co.,* 136 N. W. 271; *State ex rel. Lumber Co.* v. *Knife Falls Boom Corporation,* 104 N. W. 817; *North* v. *Broadway,* 9 Minn. 183; *Gartland* v. *Dunn,* 11 Ark. 720; *Winter* v. *Smith,* 45 Ark. 549; *Hill* v. *Dade,* 68 Ark. 409.

3.   The complaint does not allege that South, before instituting this action, applied to the corporation for a redress of his wrongs.   For this reason appellants contend that the complaint does not state a cause of action, and should have been dismissed.   As a rule, a stockholder cannot maintain an action in his own name to enforce the rights of a corporation.   Such an action cannot ordinarily be maintained except by the corporation itself in an action authorized by its board of directors.   *Holmes* v. *Jewett,* 134 Pac. 665; *Dumpfel* v. *O. & M. R. Co.,* 110 U. S. 209; *Smith* v. *Okla. Supply Co.,* 149 Pac. 879.   But, where a majority of the managing board of a corporation have betrayed their trust and are guilty of acts *ultra vires,* or fraudulent acts, and are thus perverting the purposes of the corporation; or where a majority of the stockholders and directors are diverting the assets of the corporation to their own personal use and benefit to the injury of the corporation and in fraud of the rights of the other stockholders, then any stockholder may maintain an action in a court of chancery in his own name against the delinquent officers and majority stockholders for his own and the benefit of other injured stockholders.

In such an evil case, the majority directors and stockholders, as between the corporation and its stockholders, no longer in reality represent the corporate entity.   They are acting for only themselves, although using the corporate name.   Under such circumstances, when an innocent stockholder enters a court of chancery seeking relief, that court does not treat him as some schoolmaster invoking its aid to enable him to rebuke faithless trustees for past delinquencies or to teach them sound morals and

to reform their future conduct. Not at all. Because of the exigency of such situation, the minor stockholder who brings the action in his own name is treated, for the time being, and for the purposes of the litigation, as the trustee and real representative of the corporation, instead of its offending directorate and majority stockholders. Through him, and against them, the corporation itself is granted genuine reparation by way of damages, restitution, or, if need be, dissolution of the corporation; in fact, all the relief to which the corporation would be entitled under the circumstances, were the action brought in its name. The corporation is a necessary party to such an action, and is named and brought in, that appropriate orders may be made not only to protect all the corporate rights, but also that through it the rights and equities of individual shareholders may be worked out and preserved.

The law does not require a futile ceremony. Therefore, where a majority of the directors are under the control of a majority of the stockholders, and an action is brought against them by an innocent shareholder in his own name, charging wrongdoing on their part in the manner above indicated, it is not necessary for him to allege and prove, as a condition precedent to the maintenance of the action, that, before instituting the same, he protested to the board of directors against their own mismanagement and appealed to them for redress. Such protest would fall upon deaf ears, because a majority of the directors could not be expected to authorize, or to institute, an action against themselves charging themselves with fraud. If they should do such an anomalous thing, in the language of the Supreme Court of Missouri, "the bad faith of their action would be so apparent that no court would entertain the suit." *Hingston* v. *Montgomery,* 97 S. W. 202. We conclude, therefore, that the complaint should not be dismissed because it fails to allege that the plaintiff, before instituting the action, applied to the board of directors for redress of the alleged injuries of which he complained. *Red Bud Realty Co.* v. *South,* 96 Ark. 281-

292. In addition to the authorities there cited, see also *Hingston* v. *Montgomery, supra; Hannity* v. *Theatre Co.* 19 S. W. 82; 3 Cook on Corporations, sec. 741; *Hawes* v. *Oakland,* 104 U. S. 450-460; *North* v. *Union Savings Association,* 59 Oregon, 483; *Von Arnim* v. *Amer. Tube Works,* 188 Mass. 515; *Virginia etc. Co.* v. *Fisher,* 104 Vt. 121; *Williams* v. *Erie Mt. Consol. Mining Co.,* 91 Pa. 1091; *Chicago Cab Co.* v. *Yerkes,* 141 Ill. 320; *Rothwell* v. *Robinson,* 39 Minn. 1; *Nathan* v. *Tompkins,* 82 Ala. 437.

4. The insurance company was named as a defendant in the original complaint, and it was alleged in paragraph 11 that the mortgage executed to it in the sum of $3,000 was fraudulent and void, and it was prayed that the mortgage be canceled. An answer and cross-complaint asking for foreclosure of the mortgage was filed by the insurance company signed by attorneys, Pettit & Pettit and Allyn Smith. During the progress of the trial Smith announced that he was the attorney of record for the insurance company; that its interest had ceased, and he desired to dismiss the cross-complaint and withdraw its answer. Whereupon, the attorney for the plaintiff announced that the insurance company had loaned the money in good faith to the corporation, and that on a former day plaintiff had agreed with an attorney from St. Louis, who claimed authority to represent the insurance company, that judgment might be rendered in favor of the insurance company and its mortgage foreclosed, and that the plaintiff desired to stand by that agreement, and challenged the right of Smith to dismiss the answer and cross-complaint of the insurance company.

To sustain his contention, the plaintiff filed an affidavit to the effect that he had sent a telegram to the insurance company to ascertain if any one had authority to dismiss its answer and cross-complaint and received in reply a telegram as follows: "Nobody has authority to withdraw our answer and cross-complaint against Red Bud Realty Company." (Signed) by the insurance company and by Jordan, Rasser & Pierce, counsel. The at-

torney Smith thereupon insisted that he was the attorney of record, that the record did not show he had ever been discharged, and that he had the right therefore to dismiss the answer and cross-complaint of the insurance company, and offered to make oath that he was still its attorney. Smith did not offer to testify himself or to prove that the telegram introduced was not genuine. The court thereupon found that the insurance company had indicated by its telegram that it did not want its answer and cross-complaint withdrawn, and ruled that it had the right to control its own case, and therefore overruled the motion of attorney Smith.

This ruling of the court was correct. Says Mr. Thorn ton: "The power of an attorney is not coequal with, coextensive with, or equivalent to that of the client. He is a special agent, limited in duty and authority to the vigilant prosecution or defense of his client's rights.*** An attorney certainly cannot bind his client by any unauthorized act which amounts to a total or partial surrender of a substantial right." Thornton on Attorneys at Law, p. 382, sec. 215.

As early as *Pennington* v. *Yell,* 11 Ark. 212-229, we said: "When an attorney undertakes the collection of a debt, it becomes his duty to sue out all process, both mesne and final, necessary to effect that object; and consequently that he must not only sue out the first process of execution, but also all such that may become necessary." The interest of his client is the polar star on which an attorney should and must keep his eye while directing a lawsuit from its inception to its close. 2 Greenleaf on Evidence, p. 128, § 145; *Crocker* v. *Hutchinson,* 2 D. Chipman (Vt. Rep.) 114-122. The nature of the relation is such that within this limitation the attorney is vested with a large and liberal share of discretion in conducting litigation. In the absence of a specific direction to the contrary from his client, an attorney, as stated in *Pennington* v. *Yell, supra,* "will always be justified in ceasing to proceed with his client's cause (unless especially instructed to go on) whenever he shall be *bona fide* influenced

to this course by a prudent regard for the interest of his client.'' A client, however, and not his attorney has the absolute control over the litigation instituted by him. Where an attorney is employed by a party to institute a cause of action, if the right of the attorney to dismiss the action is called in question by the client, then the law undoubtedly is that the attorney has no authority to dismiss the cause of action contrary to the wishes and over the objection of his client. See *St. L. I. M. & S. R. Co.* v. *Blaylock,* 117 Ark. 504-14; *Johnson* v. *Mo. Pac. Ry. Co.,* 140 Ark. 587; see also *Davis* v. *Webber,* 66 Ark. 190. Other authorities are collated in 6 C. J. 643, sec. 147.

It is quite unusual, to say the least, for an attorney of record to propose to withdraw his client's cause of action after there has been virtually a confession of judgment in his client's favor. Without any explanation by attorney Smith of the reason prompting him to move to dismiss the answer and cross-complaint of the insurance company at that juncture, the trial court, without questioning his motives, was nevertheless justified in treating the telegram from the insurance company as an expression of its wish not to have its cause dismissed, and as tantamount to a direction to its attorney of record not to pursue that course. There was at least a *prima facie* showing that the proposed action of the counsel, instead of being to the interest of the insurance company, was directly to the contrary.

5. The notes executed by the corporation to the insurance company bore interest on the principal sum at the rate of 7 per cent. per annum, and contained a provision that, if not paid at maturity, they were to bear interest at the rate of 10 per cent. per anum payable annually until paid. The coupon interest notes also contained a similar provision. Judgment was rendered in favor of the insurance company against the corporation for the principal sum with interest calculated as stipulated in the notes, the judgment to bear interest at the rate of 10 per cent. per annum from the date thereof. Parties may contract for the payment of interest in this State ''not

exceeding 10 per cent. per annum on money due or to become due.'' Art. 19, § 13, Constitution. Sec. 7353, Crawford & Moses. So long as the parties contract for a rate of interest that does not exceed the maximum rate allowed by the law, their contracts will be enforced as written.

The contract under review plainly provides for a rate of interest after the maturity of the principal sum not in excess of ten per cent. per annum, the maximum sum permitted by our Constitution and statute. The parties, having stipulated that the loan should bear a higher rate of interest after maturity than before maturity, are bound by their written contract, and the courts must enforce the same so long as the higher rate does not exceed the maximum limit prescribed by the Constitution and the statute. The great weight of authority is to the effect that such contractual increased rate after maturity is regarded as a liquidation of damages for failure to promptly pay, and not as a penalty. 22 Cyc., sec. 1526.

Our own court as early as *Miller* v. *Kempner*, 32 Ark. 573, announced the law in harmony with this view, from which it has not since departed. *Portis* v. *Merrill*, 33 Ark. 416. See also *National Life Ins. Co.* v. *Hale*, 154 Pac. 536, where our own cases above and many others are quoted, and among them *Linton* v. *Vermont National Life Ins. Co.*, 104 Fed. 584, where Judge SANBORN, speaking for the Circuit Court of Appeals on precisely a similar state of facts, said: ''A contract for a lawful rate of interest before the maturity of a promissory note, but for a higher, but lawful, rate after maturity, is valid and enforceable, and it entitled the holder of the note to the higher rate, before and after the judgment or decree thereon and until the debt is paid.'' The decree in favor of the insurance company was correct.

6. In April, 1918, by agreement of the parties, H. J. Denton was appointed master to state an account between them. Upon due notice to the parties the master began the taking of testimony on July 1, 1918. The parties appeared by their respective attorneys, and the tak-

ing of testimony on behalf of the plaintiff began on that day, and the hearing was continued until the 30th of July, 1918, when the taking of testimony for the plaintiff was completed, and the testimony on behalf of the defendants commenced. The hearings were continued from time to time on the application of the defendants until October 14, 1918, at which time the record recites that, "both the plaintiff and the defendant announcing that they had no further testimony to offer, the taking of evidence herein is by the master closed, subject, however, to the further orders of the court."

The defendants, upon notice, took further depositions of various witnesses on the 3rd of February, 1921, and the deposition of E. J. Loop on March 31, 1921. The court sustained a motion to suppress the depositions taken on the 3rd of February and the 31st of March 1921, on the ground that there was no showing that the "depositions could not have been taken within the time fixed for taking testimony of the witnesses in this case." From October 14, 1918, until January 1, 1919, there was a regular chancellor to whom the defendants could have applied for an order permitting them to take further testimony, but from the first of January, 1919, until the selection of the special chancellor who tried the cause, there was no regular chancellor to whom the defendants could apply for such an order. In 1908 the chancery court of Baxter County adopted a rule that in causes of action in which the proceedings were or should have been completed ninety days before the commencement of the term, depositions on behalf of the plaintiff must be taken and filed at least thirty days before the commencement of the term, and depositions on behalf of the defendant taken and filed at least ten days before the commencement of the term.

The master stated the account and filed his report on April 15, 1919. It will be observed that the master did not close the taking of testimony until the parties declared that they had no other testimony to introduce. Six months intervened before the master filed his report.

During this time no request was made of the master by the defendants to reopen the cause for the taking of further testimony. More than two years elapsed between the date when the master declared that the taking of testimony was closed and the taking of the suppressed depositions. No reason is given for the failure of the defendants to apply to the master to reopen the cause for the taking of further testimony before the filing of his report, other than that they, defendants, thought they had a right to rely on the rules of the court. But manifestly these rules could have no application where the parties by consent agree to submit the case to a master to take testimony and state an account. The announcement by the parties that they had no further testimony to offer on the 14th of October, 1918, was tantamount to an agreement that the taking of the testimony before the master should close on that day, but, notwithstanding such announcement or agreement, it was within the discretion of the master to reopen the case for further evidence at any time before drafting his report. If the defendants desired to take further testimony, it was their duty to apply to the master to reopen the cause for that purpose and give him an opportunity to exercise his discretion. 21 Cor. Jur. 613, § 772, and cases cited in notes. *Sands v. Greeley & Co.,* 83 Fed. 772.

The fact that there was no chancellor to whom the parties could apply for an order to reopen the case for taking of further testimony before the master could not excuse the defendants from applying to the master himself for permission to take further testimony. The master had discretion to grant such an order, and, for aught that appears to the contrary, might have done so, had the defendants applied therefor before the filing of his report. The taking of testimony before the master had to come to a close some time. The master certainly had given the defendants a reasonable time to produce their testimony, for he had continued the hearings eight different times at their instance, and only closed the taking of testimony after they had announced that they had no

further proof to offer. The defendants are in no attitude to complain that the testimony offered by them through the suppressed depositions would show that certain findings of .fact by the master were erroneous. See *Gilliam* v. *Baldwin,* 96 Ill. App. 323. The defendants have wholly failed to show that they exercised any diligence whatever to discover and to produce before the master the testimony which they now assert would prove palpable errors in his report. It was within the sound discretion of the trial court to suppress the depositions taken after the filing of the master's report, and, under the circumstances, we do not find that there has been any abuse of that discretion. 18. C. J. 727, § 331; *Hall & Farley* v. *Ala. Terminal Imp. Co.,* 56 So. 235; *Little Bros.* v. *Brock,* 91 S. C. 549; *Gibson* v. *Atlantic Coast Lines Rd. Co.,* 88 S. C. 360; *Anderson* v. *Long,* 56 Pa. (Sup. Ct.) 183.

7. In stating the account between Powell and the corporation upon the theory that the mortgage to the insurance company was valid (which is correct), the master found that Powell was indebted to the corporation in the sum of $12,377.12. The trial court reduced the amount, by giving Powell certain credits, to the amount of $11,262.02. It would unduly extend this opinion to discuss in detail the various items that entered into the account as stated by the master and as restated by the trial court. It is only necessary for us to determine whether Powell is entitled to have the judgment against him reduced by further credits which he claims. Among these items are $600 paid out of the funds of the corporation for capital stock in the power company; $400 for lots deeded to Kate V. Powell; $500 for lots deeded to G. B. Ortman; $90 on lots deeded to Clarence Hopkins; $40 on lots deeded to Clara Sharpe; $125 on lots deeded to Routzong; $300 on lots deeded to J. B. Baker; $250 on lots deeded to the power company; rents received from property of the corporation in the sum of $1,319.31; interest, penalities and costs arising from tax sale in the sum of $535.95.

Powell contends that the above amounts were erroneously included in the judgment against him. He further claims that he should have credit on account of expenses paid in attempting to sell lots in the sum of $1,700; the sum of $656.22 paid out of the funds of the corporation as shown by the checks of John M. Rose, secretary and treasurer of the corporation, for various items of expense; the sum of $2,750 for the salary of John M. Rose as secretary and treasurer of the corporation.

Since Powell owned a large majority of the stock of the corporation, was a director, and its president, and the management of the affairs of the corporation was thus under his control, he was a trustee for the funds of the corporation, and in handling and accounting for these funds the utmost good faith was required of him, and the burden was upon him to prove how these funds were expended. Considering briefly the above items, the purchase of the stock of the power company was *ultra vires,* and Powell was not entitled to credit for that. The testimony of Powell, corroborated by that of Horton and Baker, shows that the lots deeded to Mrs. Kate V. Powell were as a donation to put the stockholders on an equality as to lots that had been given to South. The same is true as to the lots deeded to Baker.

As to the Ortman lots the testimony of Powell shows that by an ordinance of the town of Cotter the corporation was assessed the sum of $500 for the purpose of laying concrete sidewalks; that Ortman laid these walks for the corporation, and that the directors at the meeting in April, 1911, directed deeds to be made to Ortman to the lots in payment of this sum of $500. There is no testimony in the record to the contrary. This did not involve a transaction which was peculiarly within the knowledge of Powell, and, if not true, its falsity could have been shown. The explanation was reasonable and meets the burden of proof.

As to the items in the deed to Hopkins and Sharpe, the amounts mentioned, in the absence of any other evi-

dence to the contrary, must be taken as correct. Powell's own testimony does not meet the burden of proof as to the items.

As to the Routzong lots the testimony of Powell shows that these lots were deeded to Routzong in payment of a printer's bill against the corporation. This testimony was not peculiarly within the knowledge of Powell, and, if untrue, could have been rebutted by the appellees. Powell therefore should not be charged with the value of these lots.

Concerning the lots deeded to the power company, the trial court canceled this deed as a fraudulent conveyance. Therefore Powell should not be charged with the value of these lots.

Powell was charged with an estimated amount of rents in the sum of $1,800. There is no definite proof in the record as to the amount actually received. It is certain that in making the estimate the master included rents on what is designated as the "Johnson lots," which the trial court found had been sold on the day of the first meeting of the board of directors in April, 1911. The annual rental of this property was $120. The rental on this property for the six years amounted to $720. After the sale of this property the corporation, of course, did not receive the rental, and Powell should at least be credited with that amount.

The amount of the interest, penalties, and costs arising from the tax sale accrued through the negligence of Powell in failing to pay the taxes when due. Hence he is not entitled to credit for this amount.

As to the item of expense in the attempted sale of lots no vouchers are produced by Powell to show how this expense was incurred—for what, and to whom, the amounts were paid. The testimony given by him as to this item was peculiarly within his own knowledge, and the testimony was entirely too indefinite to meet the burden of proof.

As to the salary of John M. Rose, Powell testified that after the death of Rose in 1915 the books and papers in

his possession concerning the business of the corporation were lost. He further testified that when Rose was elected secretary and treasurer of the corporation the directors voted to allow him a salary of $50 per month, but there are no vouchers to show that Rose was ever paid this salary. In the absence of vouchers or other testimony in the record tending to show that Rose was actually paid a salary of $50 a month out of the funds of the corporation, Powell's testimony does not meet the requirement of the burden of proof as to this item.

As to the items of expense paid out of the funds of the corporation as evidenced by the vouchers of Rose, the testimony is sufficient to show that Powell should be credited with the amount of these vouchers.

Summing up, therefore, the items as above indicated which should be deducted from the judgment in favor of the corporation against Powell, they are as follows:

1. Lots deeded to Kate V. Powell ............................ $400.00
2. Lots deeded to G. B. Ortman ........................... 500.00
3. Lots deeded to Routzong ............................... 125.00
4. Lots deeded to J. B. Baker ............................ 300.00
5. Lots deeded to Dixie Power Co. ........................ 250.00
6. Rents on property of corporation ..................... 720.00
7. Various items of expense shown by checks of
   John M. Rose, secretary and treasurer ........... 656.22

   Total ........................................................$2,951.22

The decree in favor of the corporation against Powell will therefore be modified by deducting therefrom the aggregate sum of the above amounts, towit, $2,951.22, and the judgment as thus modified will be affirmed. The judgment in favor of South against Powell and the corporation will likewise be modified so as to allow him his proportionate share of the amount due him under the above judgment against Powell, as modified and affirmed, and the decree in his favor as thus modified will be affirmed.

8. The trial court adjudged that "the affairs of the corporation under the management of the majority stock-

holders as now constituted, on account of the long mis-user of its corporate powers and because of continued fraudulent mismanagement and its denial of the minority stockholders' right to participate in the benefits and profits of said corporation, should be dissolved, its affairs be wound up, and its property and assets be distributed to its stockholders.''

The complaint does not allege that the corporation is insolvent, but it does allege fraud and mismanagement on the part of the majority stockholder and the directorate for the personal benefit of the majority stockholders in fraud of the rights of the plaintiff and other stockholders, to the great injury and damage of the corporation; that because of such mismanagement and fraud the corporation had ceased to transact the business for which it was chartered, and the charter of the corporation should be canceled and declared void.

Our statute gives the chancery court jurisdiction to dissolve the corporation ''in all cases where it shall be made to appear that the corporation has ceased to transact business,'' meaning of course the business for which the corporation was chartered. C. & M. Digest, § 1820. If this had been an action to dissolve the corporation under the above statute, the allegations of the complaint were sufficient to give the chancery court jurisdiction for that purpose. However, the primary purpose of this action was not the dissolution of the corporation, and the procedure prescribed in § 1821 of Crawford & Moses' Digest was not followed. Nevertheless, the allegations of the complaint stated a cause of action in favor of the minority stockholders against Powell and the corporation for relief against the alleged fraud and mismanagement of the affairs of the corporation on the part of Powell to the injury of the corporation and its minority stockholders, which, as we have seen, as one of the incidents to the relief sought, drew to it the right to have the corporation dissolved. The proof in this case justifies the conclusion reached by the trial court that Powell was no longer managing the affairs of the corporation for the

benefit of the corporate entity and all its stockholders, but was merely using the corporation for his own private purposes and entirely ignoring the rights of the minority stockholders. The testimony shows that Powell owned practically all the stock in the corporation except what was owned by South. Although having considerable sums of money in his hands at different times, no dividends were declared, and South was completely ignored, all of the funds of the corporation being indiscriminately used by Powell for his own personal benefit. If the minority stockholder has no right to resort to a court of chancery for relief under such circumstances, then he is indeed without any adequate remedy to protect his rights. An appeal to the authors of his injury to redress his wrongs would be unavailing, for the majority stockholder and the directorate under his control would have it in their power to continue forever to ignore his appeal, and thus to perpetuate their fraudulent conduct. Such is not the law. On the contrary, where there is an abuse of trust by reason of the fraudulent mismanagement of those controlling the corporation which has resulted in substantial injury to the corporate entity and its minority stockholders, a court of equity, in the language of the Supreme Court of Minnesota, "may, without statutory authority and in the absence of corporate insolvency, intervene by way of receivership, require an accounting from the delinquent officers, order a sale of the corporate assets and a dissolution of the corporation." *Green v. National Adjustment Co.*, 162 N. W. 1056; *Warner v. Bonds*, 111 Ark. 238-47; *Miner v. Belle Isle Ice Co.*, 53 N. W. 218; 4 Pomeroy on Equity Jurisprudence, § 1540; Helliwell on Stock and Stockholders, 792; *Brent v. Brister Saw Mill Co.*, 60 So. 1018; *Dill v. Johnson*, 179 Pa. 608. We are aware that there is a conflict of authority on this issue. See cases cited in appellant's brief. But we adopt the above as the correct rule. Indeed, it is the only rule that will give the minority stockholders effectual protection against the recurrence and perpetua-

tion indefinitely of such wrongs and injuries by majority stockholders as are alleged and proved by the facts of this record.

The decree in favor of the insurance company is correct, and it is affirmed. The decree in favor of the corporation against Powell, and the decree in favor of South against Powell and the corporation, except in the particulars above mentioned, are likewise correct, and, after being modified as above indicated, they are affirmed.