CONSUMERS' ICE & COAL COMPANY *v.* SECURITY BANK & TRUST COMPANY.

Opinion delivered February 22, 1926.

1. CORPORATIONS—SUIT BY MINORITY STOCKHOLDER.—Where a majority of the managing board of a corporation have betrayed their trust, and are guilty of acts *ultra vires*, or fraudulent acts, and are thus perverting the purposes of the corporation, or where a majority of the stockholders and directors are diverting the assets of the corporation to their own personal use and benefit, to the injury of the corporation and in fraud of the rights of the other stockholders, then any stockholder may bring suit in his own name against the delinquent officers and majority stockholders for the benefit of himself and other injured stockholders.

2. CORPORATIONS—SUIT BY MINORITY STOCKHOLDER—RELIEF GRANTED. —Where a minority stockholder brings suit on behalf of himself and other injured stockholders to set aside fraudulent or *ultra vires* acts of the directors and majority stockholders, he will be treated as the representative of the corporation, and through him the corporation will be granted any relief to which it may be entitled.

3. CORPORATIONS—POWERS OF DIRECTORS.—A resolution adopted on a vote of interested directors is voidable at the option of the corporation, and this rule is equally applicable where the interests of other persons, not directors, are affected by the resolution.

4. CORPORATIONS—POWERS OF DIRECTORS—PERSONAL INTERESTS.—A director cannot vote in a board meeting upon a proposition in which he is interested in a different way from the stockholders in general.

5. CORPORATIONS—FRAUD IN PROCURING LOAN.—Where the directors of a corporation borrowed money to use in buying in the shares of certain complaining stockholders at a time when the corporation had on deposit with its president more money than the amount borrowed, the transaction was a fraud upon the minority stockholders.

6. BILLS AND NOTES—INNOCENT PURCHASER—PURCHASE AFTER MATURITY.—One who purchases a note after maturity is not an innocent purchaser.

Appeal from Jefferson Chancery Court; *John M. Elliott,* Chancellor; affirmed.

*Mike Danaher, Palmer Danaher* and *W. B. Sorrels,* for appellant.

*Rowell & Alexander,* for appellee.

WOOD, J. This action was instituted by the Security Bank & Trust Company and G. L. Roth, hereafter called appellees, against the Consumers' Ice & Coal Company, hereafter called ice company, and S. R. Morgan, E. E. McIndoo, F. J. Dove, A. G. Miller, M. B. Morgan, Republic Power & Service Company and Fred A. Coller, hereafter called appellants. The appellees alleged that the ice company was a corporation, and that they were stockholders thereof; that they instituted the action for the benefit of themselves and all other stockholders, and for the benefit of the creditors of the ice company. They alleged in substance that for ten or twelve years the corporation paid annual dividends of ten per cent. to its stockholders; that in the year 1919 S. R. Morgan and other directors, who were his agents and employees, acquired a controlling interest in the corporation, and since that time they have not paid any dividends; that in 1921 S. R. Morgan entered into a conspiracy with other stockholders by which $17,000 of the treasury stock passed into the hands of Morgan. They allege that Morgan did not pay for this treasury stock, and asked for an accounting. They allege that it was a part of the conspiracy to pass the assets of the ice company to their individual use, and to that end there was a reorganization and transfer of stock in the Pine Bluff Delivery Company to one E. E. McIndoo. They set out specifically various acts of alleged misconduct in the management of the affairs of the ice company by Morgan and the directors who were in the alleged conspiracy with him, and alleged that the directors had not attempted to direct and con-

trol the business of the corporation for the benefit of its stockholders.

Among other things, it was alleged that the Republic Power & Service Company, a Delaware corporation of which S. R. Morgan was president and A. G. Miller secretary, they being likewise directors of the ice company, entered into a conspiracy to divert the proceeds of the ice company to the Republic Power & Service Company by leasing the plant of the ice company to the Republic Power & Service Company for a period of five years at a wholly inadequate rental, which was but a scheme to deprive the plaintiffs of a just return on their investment in the ice company. They asked that this rental contract be canceled. They alleged that, prior to March 4, 1921, the Pine Bluff Delivery Company was a partnership, the assets of which were owned equally by the ice company and C. H. Ahrens, or the Arkansas & Texas Consolidated Ice & Coal Company, and on that day the Pine Bluff Delivery Company was incorporated, and the directors of the ice company had 249 shares of the capital stock of that company issued to E. E. McIndoo. They alleged that this stock belonged to the ice company, and they asked that this stock be canceled, and that McIndoo be required to account for all dividends collected on the stock, and be required to transfer the stock to the ice company, and that the Pine Bluff Delivery Company be also required to account for the money, the proceeds of the sale of ice.

Following these allegations, the complaint alleged that on January 26, 1922, S. R. Morgan, as president, and F. J. Dove, as secretary, executed a mortgage on all the property of the ice company to one Fred A. Coller of St. Louis, Missouri; that on that day Morgan purchased certain stock of the ice company, and that Coller was in Pine Bluff at the time Morgan was negotiating for the purchase of the stock. They alleged that Coller had no money invested in the mortgage, but that he held the stock in lieu thereof; that the board of directors had no

authority to execute the mortgage, and that it was *ultra vires;* that a foreclosure of the mortgage would result in the stockholders losing the entire plant and property of the ice company. They asked that Coller be made a party, and that the mortgage be canceled. They alleged that Morgan and the other directors were insolvent, and that the stockholders not in conspiracy with Morgan were powerless to protect their rights.

The complaint concluded with a prayer that a receiver be appointed at least temporarily, and that all of the assets of the ice company be placed in his hands, and that if, upon a final hearing, the court found that the ice company was insolvent, and found it to be to the best interests of the stockholders, its assets be sold and distributed among the stockholders as their interests might appear, and that the $17,000 worth of stock issued to Morgan be canceled; that the contract with the Republic Power & Service Company be canceled; that the mortgage to Coller be canceled, and the stock of the Pine Bluff Delivery Company be designated the property of the plaintiffs and the trustee designated to hold this stock and to sell the same if need be for the benefit of the creditors and stockholders of the ice company; and finally, that a general accounting be had, and judgment be rendered against each of the defendants as might be found just and proper, and that S. R. Morgan and all the directors be enjoined from interfering with the property in any way, and that the receiver under directions of the court be given authority to employ auditors and do all other things necessary to conserve the assets of the ice company for the benefit of the stockholders and creditors.

The receiver was appointed temporarily, and qualified and took charge of the property, and afterwards his appointment was made permanent.

The answer denied all the material allegations of the complaint. After other proceedings were had, which it is unnecessary here to set forth, the Republic Power & Service Company and M. R. Noack, trustee, on January

3, 1924, filed a cross-complaint against the ice company, setting up the mortgage executed by the ice company on January 26, 1922, and alleging that the ice company had borrowed of Fred A. Coller $36,500, evidenced by its promissory notes due six months after date, alleging that these notes were secured by the deed of trust to Noack, trustee, on the plant of the ice company in Pine Bluff, Arkansas, and alleged that the Republic Power & Service Company had purchased these notes after maturity of same for value, and praying for a foreclosure of the deed of trust. On April 17, 1924, the receiver answered the cross-complaint, denying its allegations and alleging that the mortgage or deed of trust executed was not binding on the ice company; that there was no legal meeting of the board of directors of the ice company authorizing the directors to execute the deed of trust, and that the act of the board of directors in authorizing such mortgage or deed of trust was *ultra vires,* alleging that Coller did not advance to the ice company $36,500, and that the attempted assignment of the deed of trust to the Republic Power & Service Company was a fraud on the ice company. Among other subsequent proceedings, an auditor was appointed by the court to audit the books of the ice company for the year 1921, and he filed his report on May 12, 1924, giving in detail the transactions between the ice company and Morgan, and concluding his report as follows: "as per above debits and credits S. R. Morgan & Company is overdrawn $37,476.42."

Of the issues raised by the pleadings in the cause all were heard by consent of parties and disposed of by decree of the court entered on May 30, 1923. By that decree the court ordered that the Pine Bluff Delivery Company cancel $24,900 of its capital stock and reissue same in the name of Jo Nichol, trustee, for the benefit of the ice company, subject to the further orders of the court. The court also entered a decree canceling the note of $12,500 which had been executed by Morgan to the ice company and indorsed by that company's secretary and

treasurer to one Kinard. The court also entered a decree canceling the lease from the ice company to the Republic Power & Service Company. The court also made various minor orders in this decree, from none of which has any appeal been taken, and after entering this decree it reserved jurisdiction to "further determine the rights of all parties to any and all matters that may arise affecting them."

After this decree was entered, there was still left in the cause the matters of the accounting of the defendants, the directors of the ice company, and of foreclosing or canceling the mortgage alleged to have been executed by the ice company to Fred A. Coller. The court on that day heard these issues on all the pleadings, the reports of the receiver, and all the testimony and exhibits that had been filed in the cause. The court found, among other things, that S. R. Morgan, E. E. McIndoo, F. J. Dove, A. G. Miller and M. B. Morgan were the directors in charge of the Consumers' Ice & Coal Company during the years 1920 and 1921, and up to March 4, 1922; that during that time no dividends were paid to the stockholders; that the directors mismanaged the affairs of the company, and also withheld the earnings of the company from the stockholders; that the indebtedness incurred by the directors during the period they had charge of the plant was not paid, as evidenced by the report of the receiver and the interventions of claimants, creditors of the ice company; that the franchise tax due the State was not paid; that the income tax for the years 1920 and 1921 was not paid; that the reports of the receiver show that, by conserving the assets of the company, after paying the debts incurred by the directors above mentioned during their administration, the receiver still had a large amount of money in his hands. After making certain other special findings and setting forth brief excerpts of the evidence upon which these findings were predicated, the court reached the conclusion that the defendants, S. R. Morgan, E. E. McIndoo, F. J. Dove, A. G. Miller

and M. B. Morgan were indebted to the ice company in the sum of $80,264.96, with interest at the rate of six per cent. from March 4, 1922, the day the court found the amount was due, and demand made for the payment thereof. The court also found that the Republic Power & Service Company was due the ice company the sum of $10,266.67. The court rendered a decree according to its findings, and directed that the judgment against the Republic Power & Service Company, when paid, be credited on the judgment against the directors. The court found that the mortgage alleged to have been given by the ice company to Fred A. Coller was without consideration, and that the directors had no authority to execute the same, and that the same was fraudulent and void. The court thereupon entered a decree dismissing the cross-complaint of the Republic Power & Service Company for want of equity. To these findings and decrees of the court the defendants duly excepted, and prayed and were granted an appeal to this court.

1. It appears that, by agreement of all parties, one Fred T. Rucker was appointed by the court as master, and directed to audit the books of the ice company for the year 1921. His report is in part as follows:

"I find that the book balances as far as it goes is correct. However, the book furnished me to audit is only a cashbook and journal combined. I had no vouchers or canceled checks to verify the receipts from the Pine Bluff Delivery Company, and find that all the money received from that source was accounted for. I had no way of verifying the cash received at the plant. As I understand, the object of this audit is to ascertain the amount due the ice company by S. R. Morgan and other directors." He then sets out the various items of debit and credit as per the book, and concludes as follows: "As per debits and credits S. R. Morgan & Company is overdrawn $37,476.42."

Rucker testified that the book from which this report was made was the only book turned over to him. It con-

sisted of a cashbook and journal combined. It would be very unsatisfactory bookkeeping. It is all right as far as it goes, but there should be a ledger to carry the entries to, and there was no ledger. The book started January 1, 1921, and ended December 12, 1921. Witness had no book from December 12, 1921, to March 4, 1922, and had no book for 1920. Witness was asked to tell the court as to whether or not that is good business for a concern of the magniture of the ice company, and answered: "Well, I don't believe you will find another set of books like this in the country. This is all there is to it—from a capital of $100,000." He was asked: "Does this book give a fair statement of the business assets and liabilities?" and answered: "No sir, it does not."

On cross-examination the witness reiterated that the manner of keeping the books was unsatisfactory, and stated that he never knew of a business not keeping a ledger. He referred to certain entries, and stated they were not correctly made, but were erroneous and very unsatisfactory. He couldn't understand from an entry to which his attention was called as to what happened.

Learned counsel for the appellants do not, on this appeal, challenge any of the findings of the court except as to the amount found to be due the ice company and the findings and decree as to the mortgage. Counsel argue "that the books of the company are not shown by any witness to have been incorrect in any particular," and they say that "Morgan testified that they were correct and reflected the exact amount of the earnings of the ice company during the time he was in charge of the company, and that the $37,476.42 which was deposited with him by the company was the total amount of the earnings of the company for the years 1920 and 1921." They concede that the above amount is due by Morgan to the ice company, but say that "the court ignored these correct and certain figures shown by the books, and received instead the testimony of one H. H. Crowder, who had

nothing to do with the keeping of the books, and upon this
flimsy basis alone entered its decree for $80,264.96.''

.Crowder testified in substance that he was an engi-
neer for the ice company in 1921, and as such he kept an
account of the ice that was produced.    There were 12,601
tons that year.    The company did not do as well in 1920.
The witness thought that for the year 1920 it would
average 10,000 tons.    For the year 1921 the very highest
amount paid for labor and fuel would not exceed $30,000,
and possibly not quite so much in 1920.    Witness had a
report when he left the plant showing what the amount of
the counter sales were for 1920 and 1921, but he had mis-
placed the same, and could not tell what it was.    Witness
knew exactly what the counter sales were in 1923 until
he left the plant.    It was something like five or six thou-
sand dollars.    It was a hard matter to keep it straight
for 1921.    Witness thought it would go quite a good deal
more than $5,000 in 1921.    With reference to the books,
the witness said that some of them—he didn't know how
many—certain parties took out and put in an automobile
after the receiver took charge.    McIndoo took some of
the books upstairs and hid them under his bed.    Witness,
on cross-examination, stated that he didn't know a whole
lot about the financial transactions of the firm.    He was
around there when McIndoo was manager, but didn't
have anything to do with their books and financial affairs.
Witness actually believed from his knowledge, and from
being around the plant, that the plant didn't owe one
cent.    Witness didn't see how they paid out anything
when they left the plant $15,000 in debt, but witness
couldn't tell what Morgan had paid out after he went
there.    Didn't know anything about it.

C. H. Ahrens, the president and manager of the
Pine Bluff Delivery Company, testified that the ice com-
pany and the Pine Bluff Delivery Company entered into
the contract by which the ice company agreed to sell ice
to the delivery company beginning March 1, 1921, and
to continue for a term of five years for the purpose of

supplying the latter's trade in Pine Bluff and surrounding territory, and the delivery company agreed to purchase ice from the ice company. Under the orders of the court witness made out a statement of the ice bought from the ice company for the years 1920 and 1921. The books of the Pine Bluff Delivery Company and a statement of the account of the ice company with the Pine Bluff Delivery Company show that during the years 1920 and 1921, and up to February 28, 1922, the delivery company paid to the ice company the sum of $162,429.34.

Roane testified that he was a stockholder in the ice company in 1920 and 1921, and was also a director of the Citizens' Bank. No dividends were paid to the stockholders during that time. There was a letter in evidence from one of the officers of the ice company dated November 9, 1922, in which it was stated, as a reason why no dividends had been paid for the year 1920, that the company had invested $15,000 in ice cans. It was further stated that the actual value of the assets of the ice company was $50 per share. There is in the record an intervention of the Ohio Galvanizing & Manufacturing Company setting up a claim for these cans, alleging that same had not been paid for, and there was in evidence a letter signed by the president of the company, dated January 15, 1921, in which he states "the net profits last year ran about $20,000, which we regard as very, very poor. We have had extremely poor operating conditions for the past year, which condition has never obtained with us before, and we hope will not obtain in 1921."

The books of the ice company for 1920 were not produced. After the receiver took charge, his reports show that from March 23, 1922, to February 25, 1923, the total receipts were $81,327.81; the total operating expenses $45,177.18; that there were net earnings during that period of $36,150.63, out of which claims had been allowed against the ice company aggregating $18,983.82, leaving a cash balance in his hands of $17,166.81. His

report from February 25, 1923, to January 25, 1924, showed total receipts of $73,399.15, and total disbursements of $47,884.58, leaving cash on hand of $25,519.13.

Bottomed upon the above facts, the trial court found and recites in its decree the following:

"Viewing the matter most favorable to the directors, in the court's opinion, there was a net earning for the year 1920 of the sum of $20,000, and for the year 1921 there were 12,600 tons of ice sold. The Pine Bluff Delivery Company paid to the Consumers' Ice & Coal Company $80,317.29 from January 10, 1921, to December 21, 1921, and from January 16, 1922, to February 28, 1922, the sum of $4,946.67. The counter sales for 1921 were $5,000, making a total cash money received for the year 1921 of $90,264.96. The receiver, as shown by the reports, paid most of the labor and other debts for the year 1921. The testimony shows that the expense was not exceeding $30,000 for the year 1921, leaving $60,264.96 of the money in the hands of the directors for the year 1921 belonging to the stockholders of the Consumers' Ice & Coal Company. This amount, with the $20,000 for 1920, makes a total of $80,264.96 due the Consumers' Ice & Coal Company stockholders by the directors above mentioned. In arriving at this conclusion, the court has given the defendants the benefit of every doubt for the year 1920, and positive proof shows the earnings of 1921, and also that the directors did not pay out very much money received by them, and the receiver was forced to pay debts incurred during the years 1920 and 1921 out of the earnings of the plant for the succeeding years."

Now, the audit by the master of the books of the ice company for the year 1921 showed that Morgan owed the ice company $37,476.42, but the testimony of the master himself as above set forth showed that the books were very unsatisfactory. While Morgan concedes that he owed the above amount, we do not discover from an examination of this voluminous record where he testified that the books were correctly kept. On the contrary, the

testimony of the master himself, who made the audit, shows clearly that the bookkeeping was very defective, and that the audit was very unsatisfactory. Thus we find that there is far more testimony in the record to sustain the findings of the trial court than simply the testimony of the witness Crowder. His testimony shows positively that the ice company made 12,601 tons of ice in 1921, and certainly justified the finding of the court to this effect. His testimony further justified the trial court in finding that the counter sales for 1921 were at least $5,000, and it occurs to us that the court was justified in finding, from his testimony and the other testimony in the record, that the expenses of operating the plant for the year 1921 did not exceed the sum of $30,000. The positive statement of one of the officers of the company was to the effect that the net profits for the year 1920 were $20,000, and the books of the delivery company and the testimony of Ahrens show conclusively that the delivery company paid to the ice company during the year 1921, and up until February 28, 1922, inclusive, the amount of $90,264.96. Therefore, we conclude that all of the findings of the chancellor on the issue of accounting were supported by a decided preponderance of the evidence. Certainly it cannot be said that these findings are clearly against a preponderance of the evidence

2. On the 23d of January, 1924, the Republic Power & Service Company, hereafter called service company, and M. R. Noack, trustee, filed a cross-complaint, as already stated, against the ice company, alleging that the ice company borrowed from Fred A. Coller $36,500 for which it executed a promissory note and deed of trust conveying the property therein described, which consisted of the lots and refrigerating and ice plant thereon, and all appurtenances thereunto belonging. The cross-complaint alleges that, after the maturity of this note, the service company purchased the same from Coller, paying full value therefor. The prayer was for judgment on the note and a foreclosure of the mortgage. Coller by name

was not made a party to the cross-complaint. The ice company answered the cross-complaint, denying all of its allegations, and set up that the mortgage was *ultra vires* and a fraud.

There is in the record what purports to be minutes of a special meeting of the board of directors of the ice company held at four o'clock P. M. January 26, 1922, at the office of S. R. Morgan & Company, 123 West Second Street, Little Rock, Arkansas. The recitals of these minutes show that there were present at the meeting S. R. Morgan, A. G. Miller, M. B. Morgan and F. J. Dove, being all of the directors of the ice company. The minutes recite that there were outstanding accounts of the ice company necessary to be taken care of, and it was resolved that the president of the company, S. R. Morgan, be authorized to negotiate for a loan not exceeding $10,000. The meeting was adjourned until eight o'clock, on the same day, and there is in the record the purported minutes of the meeting held at the same place at 8 o'clock P. M. in Little Rock, January 26, 1922. The minutes recite that the business before the meeting is the securing of Fred A. Coller for money furnished the ice company on that day. The minutes recite that Coller had inspected the property of the ice company at Pine Bluff, and had loaned the company on that day the sum of $36,500, which the board had used to *purchase stock of the complaining stockholders, and for other needs of the company.* The minutes recite that it was resolved that the president and secretary be authorized to execute to Coller a note for that sum, and a first mortgage on all real and personal property of the company to secure the same. It was further resolved that the secretary be instructed to cancel the shares of stock purchased for the company, and to put the same in its treasury.

S. R. Morgan testified in substance concerning the alleged execution of this deed of trust that he was president of the ice company and of the service company; that Coller had been the fiscal agent of the service com-

pany, and had been successful in delivering large sums of money to that company. The ice company was in need of large sums of money to take up stock of complaining stockholders of the ice company, and to take the same out of the hands of a receiver, and witness asked Miller to negotiate with Coller for the money. He did so, and, as a result of the negotiations, Coller loaned the money to the ice company, which money was used by the witness to acquire 704 shares of stock. The stock was delivered to witness by the attorneys of the complaining stockholders, and witness paid to them the purchase money of the stock, and he and the secretary of the ice company executed the mortgage to Coller. Witness testified fully, explaining how the money was expended by the ice company. He stated that, after the mortgage was recorded, it was sent to Miller, in St. Louis, who closed the settlement with Coller. None of the $36,500 borrowed from Coller had been paid. The note evidencing that amount is a valid and outstanding obligation against the ice company. Witness stated that in March, 1922, the ice company had deposited with S. R. Morgan & Company $37,476.42, and that amount had never been paid to the company's receiver.

Miller testified that he was a director of the ice company in 1921 and 1922, and is still a director. He negotiated with Coller at Morgan's request for the loan of $36,500. That sum was to include the $12,500 which Coller had already advanced to the witness on certain stock of the ice company early in January, 1922. The mortgage was delivered to Coller by witness after Coller had already paid $22,000 in the middle of January. At the time the ice company executed the mortgage to Coller he had advanced a total of $36,500. The $22,000 thereof was used for acquiring stock of the ice company, which was turned into its treasury. At the time of the negotiations witness was the secretary of the Republic Power & Service Company. When the mortgage was executed, witness got cash for his stock. Witness stated he thought

he was in Little Rock on January 26, 1922, with some
other directors of the ice company, but didn't remember
all of them.   They had a stock meeting of the directors.
He had a copy of the notice of the meeting, but didn't
remember when he got it; didn't remember whether he
was in Pine Bluff on January 26, 1922, or not.   The note
and mortgage in controversy was never paid to the ice
company.   Witness negotiated the purchase of the note
for the service company from Coller in August or Sep-
tember, 1922.   The service company was a Delaware cor-
poration, and witness filed annual reports for the com-
pany.   The note was not listed in his report filed.   It
may have been listed in the total assets.   Coller was fis-
cal agent for the service company, and would sell its
preferred stock and turn the proceeds over to the service
company.   Witness in turn would indorse back to Col-
ler, and in that way the proceeds were applied on the note
of the ice company.   It was checks of other people given
to him, and witness presumed that he deposited them in
the bank.   That covered a period of three of four months
until Coller was paid in full.   The service company was
originally named Morgan & Company.   Witness was
friendly with Coller and saw him frequently.   Witness'
testimony corroborated the testimony of Morgan as to the
disposition of the funds loaned by Coller to the ice com-
pany.   When the witness negotiated the loan with Coller,
he told Coller *personally that he would see that it worked
out to Coller's satisfaction.*   It was in pursuance of that
promise that the service company took over the note and
mortgage.   The service company paid Coller the entire
$36,500.

Coller testified that   he loaned   the   ice   company
$36,500 on January 26, 1922, and took the note and mort-
gage in controversy, which were identified by him, and
these were introduced in evidence.   He sold the note
to Miller, who represented some corporation, and turned
same over to him after he was paid in full.   The note
was indorsed to the service company.   Witness, at the

time of giving his testimony, was a director and stockholder in that company, but was not at the time he sold to it the note and mortgage. He was a stockholder at that time. Witness actually advanced the money by checks for which the note was given. He had some of the canceled checks, but in the hurry to get away he didn't get them all. He had moved his office about a year ago, and had misplaced some of them. The canceled checks he had amounted to something like $31,000. The checks showed different dates from October, 1921, to January, 1922, all given to A. G. Miller or made payable to witness' order and indorsed by witness. Witness made a small loan to A. G. Miller, taking up small securities which were afterwards turned over to the company. Witness had been an investment banker for six years under the name of Coller & Company. He had an office on the same floor with A. G. Miller; had been in the brokerage and real estate business for six years. Witness didn't inherit any money. He left school in 1914. He owned the house in which he lived, but no other real estate. He was the fiscal agent for the service company for a year and a half. S. R. Morgan was president, M. B. Morgan, vice president, and A. G. Miller, secretary and treasurer. Witness was in Pine Bluff about the middle of January to look over the property with a view to making the loan. He turned over $22,000 of the money to the ice company on the twelfth or thirteenth of January, and the remainder he had advanced in different sums before that, amounting to $12,500. Two thousand was loaned afterwards to take care of small obligations. The $12,500 was loaned to Miller on his own personal security. Witness thought these securities were stock of the ice company. Witness stated the $22,000 was paid to Morgan. Witness got $22,000 by putting up some of his own security. He couldn't remember what it was. He stated he would furnish a list to the court, but he didn't do so. He didn't put up the mortgage at any bank. The money was

borrowed by witness just before the mortgage was exe-
cuted to witness.  The $22,000 was paid by drafts dated
January 7, 1922.  The drafts were made payable to wit-
ness, and signed by Anthony Coller, cashier.  The $22,000
was advanced about January 17, and witness got the
mortgage on the 26th of January.  He advanced $2,000 at
the time he got the mortgage.  The $12,500 that Miller
had obtained from witness was paid back by the delivery
of the mortgage.  Witness didn't have the check for
the last $2,000 advanced.  Witness did not see the note
and mortgage until after they were recorded.  There
were no revenue stamps on the note.  Witness sold the
mortgage to the service company *after it matured about
August, 1922.*  He indorsed the drafts, and also indorsed
the note to the service company.  The two signatures
didn't look alike.  Witness signed all the papers exhib-
ited to him.  The signatures are not all alike in appear-
ance, but they are all made by the witness.  He changed
the character of his signature because it was slow, and
he was trying to get a fast signature. Witness didn't know
who had the mortgage recorded, but it was recorded
before it came to witness, and bore the indorsement
"Mail to S. R. Morgan & Company, 123 W. Second Street,
Little Rock, Arkansas."  When a warning order was
issued for witness, and an attorney *ad litem* appointed to
represent him, and the attorney wrote to witness, witness
didn't answer, and had never filed any pleadings in the
case.

Jo Nichol testified that the first receivership was set-
tled on January 26, 1922, between 3:30 and 4:00 o'clock.
Morgan and McIndoo represented themselves, and Rowell
& Alexander represented the other parties and the wit-
ness as receiver.  Morgan and McIndoo left Pine Bluff
about four o'clock.  They were all that were there, so far
as witness knew.  Witness was in the banking business.
He had been in that business for twenty-one years, and
was familiar with signatures and handwriting.  He had
examined the signatures of Coller on the checks that

were introduced in evidence, and also on the note in controversy. *The same man did not write them.  The same man wrote the checks who indorsed the two drafts on Chicago and New York.* The $36,500 note was never presented to witness as receiver.  Witness, as receiver, warned everybody to appear and file their claim within ninety days.  Coller never presented any claim.  Nor did the service company.

Crowder testified that on January 26, 1922, he was at the ice plant until about seven o'clock.  He left the plant, and, while passing the Hotel Pines, he was called in by McIndoo, who said that Morgan was in there.  He went in and had quite a talk, and witness supposed that it was seven-thirty or eight o'clock when they left.  Witness didn't see any one else with them.

The above is substantially the testimony upon which the trial court found that the mortgage was a fraudulent instrument; that it was without consideration; that it was given for the sole purpose of defrauding the stockholders of the ice company out of their property; that the directors had no authority to execute the same; that no valid meeting of the board of directors was held authorizing the same; that the ice company did not receive the benefit of any money by virtue of said mortgage; that Coller had notice of the fraud, and that the service company did not pay any valid consideration for the note and mortgage, and had knowledge that the note was fraudulent, without consideration, and void."

In *Redbud Realty Company* v. *South,* 153 Ark. 380, we said: "Where a majority of the managing board of a corporation has betrayed their trust, and are guilty of acts *ultra vires,* or fraudulent acts, and are thus perverting the purposes of the corporation; or where a majority of the stockholders and directors are diverting the assets of the corporation to their own personal use and benefit, to the injury of the corporation and in fraud of the rights of the other stockholders, then any stockholder may maintain an action in a court of chancery in his own

name against the delinquent officers and majority stock-holders for his own and the benefit of other injured stock-holders." That is the doctrine invoked by the appellees in this case, and under it they must be "treated, for the time being, and for the purposes of the litigation, as the trustee and real representative of the corporation, instead of its offending directorate, and majority stock-holders. Through him, and against them, the corporation itself is granted genuine reparation by way of damages, restitution, or, if need be, dissolution of the corporation; in fact, all the relief to which the corporation would be entitled under the circumstances, were the action brought in its name." *Red Bud Realty Co.* v. *South, supra.* "The trust relation," says Mr. Thompson, "existing between the corporation and its directors is such that equity will not allow them to deal with the corporation for their individual benefit." Thompson on Corporations, § 1233, p. 179.

We have set forth the salient features of the evidence in this record bearing upon the execution of the mortgage in controversy to Coller, and its transfer to the service company. The facts speak for themselves. After a careful reading of the testimony in the entire record, we are convinced that the execution and transfer of the mortgage in controversy to the service company was but a part of the scheme of Morgan and his associates by which all stockholders who were not satisfied with the conduct of the affairs by the managing board, as at that time constituted, should be closed out to their detriment, and for the individual benefit of Morgan, the president of the ice company, and his associates of the managing board. Morgan and Miller were the outstanding figures in the negotiations, and Coller was but a figurehead and intermediary through whom Morgan and Miller conducted their negotiations resulting in the execution and transfer of the mortgage to the service company, and which were finally to end in the sale and transfer of the entire plant of the ice company by foreclosure of the

mortgage. It occurs to us that such end was contemplated from the beginning. Unless it was intended from the beginning that he should have no responsibility in the end, it is unbelievable that one of real business acumen, in a transaction of this magnitude, when sued to set aside a mortgage which he had transferred to another would be utterly indifferent to the action, as the testimony of Coller himself shows that he was, by not answering the letter of the attorney *ad litem* appointed to represent him in the litigation.

The law is well settled that "a resolution adopted on a vote of interested directors is voidable at the option of the corporation, and this rule is equally applicable where the interests of other persons, not directors, are affected by the resolution." A director "cannot vote in a board meeting upon a proposition in which he is interested in a different way from the stockholders in general." See §§ 1227-1229, 1232, 1233, 2 Thompson on Corporations, and numerous cases cited in notes.

Miller had four hundred shares of the stock of the ice company which he sold at a handsome profit by virtue of the mortgage executed to Coller. This fact alone rendered the mortgage voidable at the instance of the corporation and its injured stockholders. The service company was not an innocent holder, as the allegations of its cross-complaint and the uncontroverted proof show that it acquired the note and mortgage after the note had matured. 1 Daniel, Negotiable Instruments, § 782. The testimony is uncontroverted that, for five or six years continuously before the management of the ice company passed into the hands of the appellants, the stockholders were paid a dividend of at least ten per cent. per annum on their investment. Nichol, the receiver, testified that the ice company was "a money-making proposition, and ought to pay the stockholders fifteen per cent. annually year in and year out." But the proof is that, after the appellants took charge, no more dividends were paid to the stockholders. No good reason is found in the record

for this sudden and radical change in the financial conditions, except that it was attributable to a change in the directorate, and to their mismanagement of the affairs of the ice company. Hence, it naturally followed that stockholders, aggrieved at the management which had proved so disastrous to their financial interests, would seek, as some of them did, to have the affairs of the ice company taken out of the hands of the appellants, and to have them account in damages for their mismanagement. The wisdom of this course is amply demonstrated by decrees in favor of the corporation from which there was no appeal, and by the decree herein for damages, which we find must be affirmed.

The recitals of the minutes of the purported meeting of the directorate at which the execution of the mortgage was authorized, show that the purpose of the mortgage, as stated by Morgan, was to secure Coller for the money which he had advanced, and which had been used to purchase the stock of the *complaining stockholders, and in order to take the ice company out of the receivership.* Thus, it conclusively appears that the primary purpose of Morgan and his associates was to buy their peace from the complaining stockholders, and to have the management of affairs restored to the directorate. By paying the then dissatisfied stockholders a liberal premium on the par value of their stock, they succeeded temporarily in regaining the lost control and in escaping, for the time, the action and impending liability for damages. If this arrangement had only been permanent and binding on the corporation and all of its stockholders, the appellants, individually, would have been immensely benefited financially. The directors had no authority to mortgage the plant of the ice company for such purpose.

It is not perceived how the corporation and its creditors and stockholders would have been benefited by the restoration of authority to a directorate that had been "weighed and found wanting," and which was liable to the ice company in a large sum on account of its mis-

management. Moreover, even if the directors had authority to mortgage the plant of the ice company "to purchase the stock of the complaining stockholders," the exercise of such authority, under the circumstances, was fraudulent. Morgan admitted that "at the time this mortgage was executed the ice company had on deposit with him $37,476." This fact, "trumpet-tongued," challenges the good faith of the transaction. Because, if the directors had been actuated by a *bona fide* purpose to conserve the interests of the ice company, rather than their individual interests, it is inconceivable that they would have plastered a mortgage on its plant when there were ample funds in the treasury to purchase the stock of the then complaining stockholders, and the stock of director Miller, leaving a respectable balance for "present needs."

We need not pursue the subject further. The trial court correctly appraised the testimony and ruled correctly in holding that the directors had no authority to execute the mortgage under the circumstances, and that such mortgage was a fraud on the appellees, of which the service company had to take notice, and which appellees had the right to set aside and cancel.

3. In the court's decree we find the following: "The court also finds that the Republic Power & Service Company, under lease contract, had charge of this plant from October 1, 1921, to March 4, 1922, and it collected from the Pine Bluff Delivery Company the sum of $10,266.68, and, although this lease contract was declared null and void by this court, the Republic Power & Service Company has not delivered the money collected by it from the Pine Bluff Delivery Company to the receiver." Upon the above finding the court rendered a decree in favor of the receiver. The appellants, upon whom the burden rests to show error in the findings and decree of the trial court, have not brought into their abstract any proof that the court erred in its findings and decree in this matter. The decree is correct throughout, and is therefore affirmed.