LYON *v.* BOLLIGER.

4-9920 253 S. W. 2d 773

Opinion delivered December 22, 1952.

Rehearing denied January 26, 1953.

*Wright, Harrison, Lindsey & Upton,* for appellant.

*Townsend & Townsend,* for appellee.

WARD, Justice. On August 31, 1951, appellee, plaintiff below, filed suit in the 2nd Division of the Pulaski County Chancery Court against Stanley E. Lyon, Granvil E. Grass, Louise Grass and Motor Products Manufacturing Company (the latter being a corporation), asking for judgment in the amount of $3,800 against Stanley E. Lyon and Granvil E. Grass, for a receiver to take charge of the assets of the corporation, and for a dissolution of the corporation.

The factual background leading up to the filing of this suit will be helpful to a clearer understanding of the issues. The year before the suit was filed Stanley E. Lyons and Granvil E. Grass, as partners, were engaged in manufacturing and selling a product labelled "Lustre Chrome". This product was designed to refinish chrome on automobiles, and was sold in cartons of one dozen packages to service stations, used car dealers and other retail outlets. Soon thereafter appellee was employed by said partnership as a salesman and worked about three months when he started a similar business for himself selling "Steel Chrome", which was similar to, if not exactly like, the product sold by the partnership and put up in the same kind of packages. A few months later, on or about May 9, 1951, the three men, having decided to go into business together, formed a corporation called "Motor Products Manufacturing Company", which corporation was to carry on the same kind of business, selling "Lustre Chrome". Each of the three men held equal shares of stock in the new corpo-

ration and all three were elected to the three-man Board of Directors. Lyon was elected President; Grass, Vice-President, and Bolliger, Secretary-Treasurer, all for a term of one year. The corporation employed five salesmen who sold on a commission basis. The three stockholders also spent most, if not all, of their time on the road as salesmen but on a different basis, however, as will be explained presently. Whereas the cartons were charged out to the regular salesmen for the price of $7 each, they were charged out to the three stockholders at the price of $2 each, the latter price being approximately the cost of manufacturing. It appears that the product was manufactured or assembled at or near the places of residence of the three stockholders by employed help under the supervision of the three stockholders.

Sometime in July, 1951, a difficulty arose between appellee and the other two stockholders concerning the manner in which the business was being conducted, and numerous discussions failed to culminate in any satisfactory arrangement. Apparently the trouble started because appellee disapproved of the employment of his sister, the wife of Granvil E. Grass, as a bookkeeper, and also he entertained the impression that the other two stockholders were trying to discharge him as secretary-treasurer of the corporation. It is the contention of the appellee that as a result of these conferences he was relieved of his official capacity in the corporation and also that he was denied the right to sell products of the corporation on the favorable terms mentioned above.

One of the principal contentions of appellee is that before and at the time of the formation of the corporation, the three of them had the understanding that their wives would not be used as employees in any capacity, that each of them would have the right to sell their products on the road, and that there would be no partiality in the assignment of sales territory.

Among other things the complaint alleges: that contrary to the by-laws and without the authority of the

Board of Directors, the President had hired Mrs. Grass as an employee and had fixed her salary; that meetings of the shareholders and directors of the corporation had been held without notice to him; that the other directors had refused to establish a bank account as provided for in the by-laws, and had permitted unauthorized persons to sign checks; that Granvil Grass had used the corporate funds for his own use and expenses; that the other directors had refused to allow him to examine the corporate books and refused to permit an audit of the books; that there was such dissension among the directors and shareholders as to impair the operations of the corporation on a profitable basis; and that although it was agreed before the incorporation that each shareholder would be allowed to sell the product, he was informed about July 28, 1951, that he would no longer have that privilege. The prayer was for damages in the sum of $3,800 and a dissolution of the corporation. The complaint was later amended to include a share of the profits made from sales by the other two directors after July 28, 1951.

Appellants filed a general denial and also asked for judgment against appellee for the price of 28 dozen cartons of "Lustre Chrome" which he allegedly took without authority from one of the salesmen.

The Chancellor found that appellee was entitled to damages in the amount of $3,000, against which he offset earnings in the amount of $893. A receiver was appointed and the corporation was ordered dissolved.

It appears that at the first day of the hearing, and after only the witnesses for appellee had testified, the Chancellor made an interlocutory order. In this order he set December 10, 1951, for a final determination of the case, ordered 200 dozen cartons of "Lustre Chrome" to be turned over to appellee for sale and distribution in territory of his selection, granted appellee full access to the books of the corporation, and ordered the corporation to continue to do business as usual.

On December 10, 1951, appellants' testimony and appellee's rebuttal testimony were taken and on December 17th the Court rendered its decree in which judgment was given to appellee as before stated; a receiver was appointed and ordered to deliver to appellee 100 cartons at $2 each, and the corporation was dissolved. Appellants were also permanently enjoined from disposing of any assets or papers of the corporation.

The main contention of appellants on appeal is that the Court had no right to dissolve the corporation, but there are several other assignments of error which we will first mention but need not discuss fully in view of the final determination we make herein. One is that the Court was not justified in turning over to appellee 200 dozen cartons of "Lustre Chrome" at the conclusion of appellee's testimony on November 28th. Another is that the Court adjudged them guilty of contempt without giving them a chance to be heard, and still another is that the Court was not justified in appointing a receiver. Some of these questions can be resolved upon remand of the cause.

Appellee prayed for damages and also for a dissolution of the corporation because of the misconduct of appellants, as set out heretofore. Since we are hereafter concluding that the Court had no right to dissolve the corporation because appellee did not sustain the allegations of his complaint, it follows that he is not entitled to damages. Before discussing the one serious contention made by appellee and the one upon which this decision turns, we shall discuss briefly appellee's other contentions.

It was alleged that appellants hired Mrs. Grass to keep the books and fixed her salary; that appellants refused to establish a bank account as provided by the by-laws of the corporation; that unauthorized persons were permitted to sign checks. These allegations were not sustained by the evidence and even if they had been it seems that none of the acts was of such magnitude as to justify a dissolution of the corporation, as will be later

shown. Mrs. Grass was employed to keep books and write checks, but it was done with the consent of the majority of the directors, and it was explained that she was and appellee was not in a position to do this job. Certainly no loss to appellee or impairment of the corporation was shown to have resulted thereby. The same thing can be said about the failure to designate a bank. The facts are that the corporation just continued to use the same bank that had been used by the partnership before the formation of the corporation. It was not shown that any damage or impairment resulted. Appellee also alleged: (a) that the stockholders held meetings without notice to him [he admitted, however, that he knew of no such meetings]; (b) that Grass had used corporate funds for his own personal use [this, however, was not sustained by the evidence]; and (c) that the majority stockholders [Lyon and Grass] had refused to have the books audited [again this was not borne out by the evidence].

Two allegations and two contentions are made by appellee which require special consideration. The first is that when the corporation was formed it was understood by all three of the incorporators that each of them would have a right to sell their product on the road in territory impartially selected. The very nature of their business makes this a very important consideration as it was only in this way that appellee could hope to obtain the maximum benefits. The privilege of buying from the corporation at cost and selling for a large profit was the way in which the stockholders could expect to gain more profit than the ordinary salesman who had to buy at a less favorable price. It is true, as contended by appellants, that the evidence establishing this oral agreement is not entirely clear and satisfactory but we think it is sufficient, considering what we have already said, to establish the fact that such an understanding was entered into as contended by appellee.

The other allegation and contention by appellee, which it was necessary for him to sustain before he was

entitled to a dissolution of the corporation, is that appellants refused to allow him to carry out the purpose of the corporation, viz., to buy company products at cost and sell them to the buying public. In our opinion appellee has failed by the evidence to substantiate this second contention.

From the testimony offered by appellee and his witnesses we get the impression that appellee, for some reason, first became dissatisfied because his sister, Mrs. Grass, was engaged to keep books and write checks for the company, that he was jealous of his title as Secretary-Treasurer which he thought he was going to lose, and that he started a course of action to get himself discharged by his two fellow stockholders for the very purpose of having the corporation dissolved. Much of the testimony relied on by appellee to sustain his contention before the Court consists of conversations by the three of them at a Board meeting on the 28th of July, 1951. The very inception of this meeting and the way it was arranged lends credence to the appearance that he was trying to trick Lyon and Grass into discharging him. This meeting was held in appellee's room in which he had installed, without the knowledge or consent of Lyon and Grass, a recording machine. A transcription of their conversations on this occasion is in the record, and the very beginning, which we set out below, is significant:

"Bolliger (on telephone): Oh, you can't do any such thing. Marion has gone to the beauty parlor so let's hold the meeting up here where there is no one to bother us. In fact, I'm sick, so let's have it up here. I'm already undressed and everything else. How about coming up here? You're not sick, Stan, I am the one that's sick. I don't feel flippant about the matter, Stan, I don't feel flippant. So come on up here."

The conversations that follow are far from convincing that appellee was denied the right to sell products of the company. Most of the objections made by appellee were to the appointment of Mrs. Grass as bookkeeper and were based on the assumption that he was

thereby being relieved as Secretary-Treasurer. No objection was made to her employment on any other ground. In one place the following appears:

"Bolliger: I was elected for a year. Why are you removing me?

"Grass: Bud, we are not removing anybody . . .

. . . . . . . .

"Grass: Now, Bud, let's just lay our cards on the table. Have you talked to an attorney on these by-laws?

"Bolliger: I have."

Appellee was again objecting to Mrs. Grass signing checks and there was a misunderstanding about what could be done under the by-laws, etc.

"Bolliger: Well what is your reason? What are you guys' reasons?

"Lyon: The only reason I have is that I'd rather have Helen [Mrs. Grass] down there signing checks. Should you sign a check, me sign a check and Grass sign checks?

. . . . . . . .

"Bolliger: Is that right, Grass? You have made her treasurer.

"Grass: No, not treasurer, she's cashier."

. . . . . . . .

"Grass: Nobody's trying to take the office of treasurer away from you.

"Bolliger: Well, I don't care anything about the title if I can't have the function."

. . . . . . . .

"Bolliger: Well, how can you stop me from being treasurer unless you remove me from office?

"Lyon: Then consider yourself removed from office.

"Bolliger: Then I can consider myself removed from office?

"Lyon: You can have the title but not the authority.

. . . . . . . .

"Bolliger: All right, are you going to vote me out as treasurer?

"Grass: No.

"Lyon: No."

Bolliger then asked if they were going to make Helen secretary and Lyon responded that they were only going to make her bookkeeper. Then followed much discussion about what bank would be used and it was explained to appellee that they would retain the same bank for the time being. It was further explained that Helen would be available at all times to keep books and write checks, and that appellee would not be available due to the fact that he would be out on the road.

Even though appellee was at one point told he could consider himself relieved of his office as Secretary-Treasurer, it seems to us that he more or less goaded his associates into making such statement. Moreover, it appears that none of them understood just what authority they had under the by-laws and that the real intent of Lyon and Grass was not to discharge appellee but merely to give certain secretarial functions to Mrs. Grass which apparently was a reasonable thing to do. In all events this evidence falls short of establishing the one important element, i. e., that Grass and Lyon prevented appellee from selling products of the company. One statement that comes close to establishing this point is the testimony of Grass when he stated:

"Q. When was that subject mentioned, do you recall? [referring to marketing products]

"A. Well the first instance on it that I recall actually came up on it was when we asked him [appellee] to turn over this inventory sheet of the corporation

which was property of the corporation. I told Mr. Bolliger at the time, I said 'If you force us to have to go into Court to get a court order to get what is rightfully the property of the corporation', I said that I would do my best to see that he didn't represent this company on the road anymore as a sales representative.

"Q. And that was the only thing ever said?

"A. That's the only time I talked with the man since that date."

At most, Grass' statement was a threat which was never carried out. If the above could be interpreted to mean that Grass definitely prevented appellee from selling at any time, it was offset by the testimony of Lyon when he stated:

"Q. Have you ever told him [appellee] that he could not sell products of the corporation?

"A. I never have."

Grass, of course, could not discharge appellee if he tried without the consent of Lyon.

As previously stated, the one important fact incumbent upon appellee to establish was that he has been deprived of the right to sell products of the company. It is evident from the secret recording of the meeting on the night of July 28th that he was not at that time so deprived. Appellee admits as much in his testimony, as will appear from the following excerpt thereof:

"Q. Now when did you first learn you were not going to be able to sell the products of the corporation? You learned you were not going to be Secretary-Treasurer at the July 28th meeting, when did you learn you were not going to be allowed to sell the product?

"A. I believe an hour or so after that, or the next day."

No explanation was made by appellee on his direct examination as to just what was said to him. Later, on cross-examination, he stated that he had had no other conversations with Lyon or Grass after that time, but did

explain that he had some property which belonged to the corporation and when he refused to turn it over to the corporation he stated that Grass and Lyon told him he wouldn't be selling any more. This alleged statement was explained by appellants, saying they told appellee that if they had to go to court to get the books and property of the corporation, they would try to see that he didn't sell any more. From all this we are not convinced that Grass and Lyon meant then or mean now to refuse to let appellee sell products of the company provided he wishes to do so in a reasonable, cooperative spirit.

From all the evidence we are convinced that appellee's own conduct and lack of cooperation contributed to whatever trouble he finds himself now in, and, further, that the conduct of appellants and the changes which they sought to make appear to be reasonable and for the best interest of all concerned. In fact, their language used at a time when they did not know it would be recorded indicates that they used considerable restraint and patience.

For us to hold that appellee has a right to dissolve this corporation because many of the decisions made by the majority of the directors were not agreeable to him even though considered for the best interest of the company would be to place in jeopardy the very existence of any business conducted through the medium of a corporation. Such a holding would be against the whole spirit of the law providing for the organization and management of business corporations. Many cases support the fundamental rule which is set out in 19 C. J. S. § 1647, at page 1418, which reads:

"In the absence of statutory authorization, as a general rule a court of equity has no jurisdiction to dissolve a corporation or appoint a receiver thereof."

The above quotation appears almost verbatim in Am. Jur., Vol. 13, at page 1164, § 1295. The general rule is again stated more fully in 39 L. R. A. (N. S.) at page 1032 in these words:

"I. General rule. The general rule has been as-
serted that corporations are the creatures of the state,
hence, in general, their life depends upon the action of
the state or the stockholders as a whole; and especially
if a going concern whose charter or franchise has not yet
expired, they cannot, in the absence of statute, be dis-
solved at the instance of a stockholder by an action in
equity for that purpose, and therefore equity is with-
out jurisdiction of a suit by a stockholder, the principal
purpose of which is to wind up the affairs of the corpo-
ration or to have a receiver appointed with that end in
view.''

The same authority recognizes that some jurisdic-
tions make an exception to the general rule in case of
fraud or mismanagement and some do not. Regarding
those jurisdictions that do not recognize any exception
to the general rule, in a note at page 1034, it is stated:

"But even where the question has been squarely
raised, in many jurisdictions it has been denied that
fraud or mismanagement of the corporate property by its
officers affords any ground for equity jurisdiction to
dissolve the corporation in a suit by a stockholder.''

Our own Court goes along with those states that do
recognize the exception to the general rule but only in
cases of fraud or mismanagement, as will be later noted.
In the case of *Corning Custom Gin Co.* v. *Oliver,* 171
Ark. 175, 283 S. W. 977, wherein an action was brought
in Chancery Court to dissolve a corporation, our Court
applied the general rule, in this language:

"Where the corporation is a going concern it is
undoubtedly true that a minority stockholder can not
maintain a bill to have it dissolved or to have its assets
distributed. In such case if the shareholders disapprove
of the company management or consider their specula-
tion a bad one, their remedy is to elect new officers or
to sell their shares and withdraw.''

We very readily understand that a grave injustice
would be done to appellee who entered the corporation

with the understanding which he asserts and was later arbitrarily prevented from doing the one thing which was calculated to be remunerative to him, that is, to be allowed to sell products of the company which he could purchase at cost. If this were the situation, courts of equity would still be open to him for relief, notwithstanding the general rule announced above, as is indicated in the case of *Red Bud Realty Company* v. *South,* 153 Ark. 380, 241 S. W. 21. In this case the court enumerated some of the facts justifying a dissolution of the corporation as follows:

"The proof in this case justifies the conclusion reached by the trial court that Powell was no longer managing the affairs of the corporation for the benefit of the corporate entity, but was merely using the corporation for his own private purposes and entirely ignoring the rights of the minority stockholders. . . . Although having considerable sums of money in his hands at different times, no dividends were declared, and South was completely ignored, all the funds of the corporation being indiscriminately used by Powell for his own personal benefit."

Thereupon the court further states:

"Where there is an abuse of trust by reason of fraudulent management of those controlling the corporation which has resulted in substantial injury to the corporate entity and its minor stockholder, a court of equity, in the language of the Supreme Court of Minnesota, 'may, without statutory authority and in the absence of corporation insolvency, intervene by way of receivership, require an accounting from the delinquent officers, order a sale of the corporate assets and a dissolution of the corporation."

In our judgment the evidence in this case falls short of bringing it within the exception to the general rule, above announced, and that, therefore, the cause must be reversed with directions to the lower court to: (a) dissolve the receivership after the receiver has made a report and accounting: (b) grant a hearing to appel-

lants on the matter of contempt if the court does not see fit to dismiss the same of its own accord; (c) set aside the judgment for damages against appellants; (d) set aside the judgment dissolving the corporation; and (e) make such other necessary adjudications as are not inconsistent with this opinion.

McFADDIN, J., dissents.